COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  | § |  |
|---|---|---|
| FRANCISCO CASTANEDA, | § | No. 08-10-00050-CR |
|  | § |  |
| Appellant, | § | Appeal from the |
|  | § |  |
| V. | § | 168th District Court |
|  | § |  |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
|  | § |  |
| Appellee. | § | (TC# 20070D05611) |

**O P I N I O N**

Francisco Castaneda appeals his conviction of capital murder. On appeal, he argues the evidence was legally and factually insufficient to support his conviction, that the trial court erred by denying his motion to suppress evidence found as a result of a warrantless search of another's vehicle, and that the court erred by admitting an interview of a child witness into evidence because it violated his constitutional rights to confront and cross-examine the witness.

At 11 p.m. on November 19, 2007, Ms. Abigail Castaneda ("Ms. Castaneda"), Appellant's sister, called 911 and reported that a three-year-old child, Jacqueline Gonzalez ("Jacqueline" or "the victim"), had fallen and was lying on the floor. Ms. Castaneda stated that she saw the child on the floor of the apartment where Appellant and his girlfriend, Ms. Yara Perez ("Ms. Perez"), lived, and that the child was not breathing and might be dead.[1] Ms. Castaneda warned that Appellant and Ms. Perez told her they might kill themselves if they

---

[1] The State offered into evidence electricity bills and visa applications linking both Appellant and Ms. Perez to the apartment, where the crime occurred. However, other defense witnesses testified that Appellant resided with his mother at another location.

heard sirens. She also volunteered to wait at a gas station near the residence and lead officers to the residence.

El Paso Police Officer David Gonzalez testified he was dispatched to the apartment as a result of Ms. Castaneda's call. He first met Ms. Castaneda at a Diamond Shamrock store within view of the apartment. Ms. Castaneda appeared frantic, and told the officers that they needed to get into the apartment to check on the little girl. Other officers knocked on the apartment's door and windows, and loudly announced that they were police and for the residents to open the door. There was no response from inside the apartment. Some minutes later, Officer Gonzalez saw a female looking out a window, and the officers forcibly entered.

The officer found Appellant standing next to the door. When asked why he did not open the door, Appellant replied that he was about to open it. Officer Gonzalez then asked Appellant where the little girl was, and Appellant pointed to a bedroom. Officer Gonzalez went to the bedroom, and found Ms. Perez with a little girl, later identified as then five-year-old Yara Belen ("Belen"), on a bed. Officer Gonzalez thought that this girl was the one Ms. Castaneda had called about, and he asked the EMS to check on the girl.

When Officer Gonzalez went back outside, Ms. Castaneda was crying, yelling, and screaming that there was another little girl in the apartment. Officer Gonzalez went back inside and asked Appellant where the other little girl was. Appellant replied that she was with Ms. Perez's mother. Another officer testified that Appellant first stated that she was with her biological father, and then said she was with her grandmother. Ms. Perez refused to say where the other little girl was.

Officer Gonzalez had been told by Ms. Castaneda that Appellant had a car parked outside. Officer Gonzalez asked for consent to search the vehicle, and Appellant consented. When the officer opened the trunk, he saw a small blue tub with clothes on top. As he was searching the trunk, the tub tipped over, exposing the child's body inside. The paramedics at the scene estimated that the child had been dead for some hours. Her body was covered with numerous bruises. Appellant and Ms. Perez were immediately arrested.

The next morning, Detective Ray Sanchez interviewed Appellant.[2] In the interview, Appellant stated that the day before he babysat the victim while Ms. Perez was at work. He stated that he babysat the victim from time to time. According to Appellant, after Ms. Perez returned from work before 3 p.m. that day, Jacqueline started feeling sick while she was eating. She complained about her stomach. Jacqueline was given some medication, he though that her condition improved. At 7 p.m. that night, Appellant and Ms. Perez gave her some Kool-Aid and grape juice. He stated that around 9 or 10 p.m., they found the child unresponsive and not breathing and they tried CPR, but they did not know whether she was alive or dead. Appellant claimed that Ms. Perez hit Jacqueline and he denied any responsibility for the child's injuries. But he could not answer why he did not call 911. After giving this statement, as Appellant was being booked into jail, a detective on the case heard Appellant tell Ms. Perez, "I'm sorry for what I'm putting you through."

The same day, Ms. Laura Moreno Frescas, a forensic interviewer for the Child Advocacy Center of El Paso, conducted a video-recorded interview of Belen. During this interview, Belen

_____

[2] This video-recorded statement by Appellant was admitted into evidence, and played to the jury during trial.

referred to Appellant as her father. Belen stated that her sister had stomach and groin pain and was throwing up. She also said that when her sister was lying down with her eyes closed, Ms. Perez said that she was dying. She also recalled Appellant calling Andre's mother to come help because Jacqueline was dying.[3] Belen said that when she lied, Appellant hit her with his hand and a shoe and that he would hit Jacqueline when somebody did something wrong at home.

On December 11, 2007, Appellant was indicted for the capital murder of the three-year-old Jacqueline Gonzalez. The State did not seek the death penalty. Appellant pled not guilty to the allegations in the indictment. At trial, the State presented the testimonies of the police officers, paramedics, forensic scientists, latent print and fingerprint examiners, and a medical examiner. A post mortem report regarding the victim by Dr. Juan Contin, the medical examiner, indicated that there were at least seventy impact points on the victim's body. He opined and testified that the victim's cause of death was a result of "blunt force injuries" to her abdomen, which was instigated by physical abuse. He testified at trial that the victim's death was specifically caused by internal bleeding because of trauma to the abdomen. According to Dr. Contin, the injuries could have been caused by hitting the victim with a smooth object, or by striking her body against some smooth object. He testified that the victim's injuries would have been extremely painful, that she would have been incapacitated, and that she would have died from this type of injury within an hour.

The blue tub that contained the victim's body was admitted into evidence, and crime scene officers were able to lift a fingerprint from a handle of the tub. The print was made by Appellant's left ring finger. The crime scene officers were not able to state when Appellant left

---

[3] "Andre's mother" was later identified as Ms. Castaneda.

his fingerprint on the tub, however. DNA analysis was conducted on some items collected from the scene, including a blue blanket in which the child's body was wrapped, and blood-stained trash in a trash can in the apartment's bathroom. The blue blanket contained a mixture of DNA from the victim and Ms. Perez, and the blood-stained trash contained a mixture of DNA from the victim and Appellant. However, there was no evidence when the DNA was deposited on any of these items.

At trial, the State presented the testimony of Ms. Cynthia Torres, a neighbor who lived in the same apartment complex as Appellant and Ms. Perez. Ms. Torres testified that she saw Belen and Jacqueline playing outside just after 5 p.m. on the day Jacqueline died. She also testified that she occasionally saw Jacqueline limping or crying. Ms. Elizabeth Gonzalez, the victim's paternal grandmother, testified that she had asked Belen and Jacqueline whether Appellant treated them well, and both said no. She testified that the two little girls were afraid of Appellant. Finally, she testified that she saw Ms. Perez slap Belen on the face once. The interview of Belen by Ms. Frescas was also admitted into evidence as both a DVD recording and a transcript. Ms. Frescas also testified at trial as to what Belen had told her during the interview.

In his defense, Appellant presented the testimonies of Ms. Graciela Padilla and Ms. Susie Gurrula, neighbors of Appellant's mother, and Ms. Abigail Castaneda, Appellant's sister.[4] At trial, Ms. Castaneda testified that on the day of the incident, she called the apartment where Appellant and Ms. Perez resided to speak to Appellant, but Ms. Perez answered and refused to let

---

[4] Initially, Ms. Castaneda was cooperative with the police, and gave a statement regarding the reported incident by going to the police headquarters on November 20, 2007. However, when the police attempted to contact Ms. Castaneda a day later, and several times after that, so as to secure additional answers to questions, she never returned to their office. Ms. Castaneda denied this at trial.

her talk to Appellant. When she called back, there was no answer, and after calling several more times without avail, she left for work. About 9 p.m., Ms. Perez called Ms. Castaneda at work. Ms. Castaneda testified that Ms. Perez was crying hysterically, that she was going to commit suicide, that Jacqueling was not breathing. Ms. Castaneda said that Ms. Perez also said the child had fallen from the bed, and then "changed her story" and said that she had fallen from the balcony. Ms. Castaneda asked to speak with Appellant, but Ms. Perez refused, though Ms. Castaneda could hear Appellant's voice over the phone. Ms. Castaneda testified that Appellant sounded anxious, but the phone call suddenly ended. Ms. Castaneda then called several times before Ms. Perez finally answered, and she would not let her talk to the Appellant and hung up the phone again.

Ms. Castaneda then testified that she left work and drove to Appellant's apartment. It was completely dark, and she repeatedly knocked on the door. Finally, Ms. Perez opened the door, and Ms. Castaneda saw Jacqueline lying on the floor looking up at the ceiling. Appellant was standing behind Ms. Perez, and he seemed to be in shock and crying. Ms. Castaneda then claimed that she left the apartment, and returned to her workplace. From there, she called the apartment a few times, and Ms. Perez eventually answered and sounded hysterical. Ms. Castaneda did not hear her brother in the background this time, and she told Ms. Perez to call for an ambulance. Ms. Perez only replied by saying that she was going to kill herself. Eventually, Ms. Perez informed Ms. Castaneda that the ambulance and medics had arrived in a suspicious and calm voice.

Ms. Graciela Padilla, another defense witness, who was a neighbor of Appellant's mother, testified that she saw Ms. Perez with her daughter at Appellant's mother's apartment at

2 p.m. the day Jacqueline was killed. Ms. Padilla testified that she saw Ms. Perez grab the child by her neck and throw her inside the apartment that day. She testified that Ms. Perez was a violent person. Ms. Susie Gurrula, another neighbor of Appellant's mother, testified that Ms. Perez was not a peaceful person.

In Issues One and Two, Appellant contends the evidence was legally and factually insufficient to support his conviction for capital murder. Although Appellant presents these arguments independently, we may only address the legal sufficiency challenge. *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex.Crim.App. 2010)(holding that "the *Jackson v. Virginia* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense . . . ."). A legal sufficiency review requires the appellate court to determine whether, "[c]onsidering all of the evidence in the light most favorable to the verdict, was a jury rationally justified in finding guilt beyond a reasonable doubt." *Id*. at 899, *citing Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). In conducting this review, we must defer to the jury's role as the sole judge of the credibility and weight that testimony is to be afforded. *Id*. at 899.

Our duty is to determine whether the explicit and implicit findings of the jury are rational in a light most favorable to the verdict. *Adelman v. State*, 828 S.W.2d 418, 422 (Tex.Crim.App. 1992); *Levario v. State*, 964 S.W.2d 290, 294 (Tex.App.--El Paso 1997, no pet.). We resolve any inconsistencies in the evidence in favor of the verdict. *Matson v. State*, 819 S.W.2d 839, 843 (Tex.Crim.App. 1991). The introduction of conflicting evidence does not render evidence insufficient. *Matchett v. State*, 941 S.W.2d 922, 936 (Tex.Crim.App. 1996). We assume that the fact finder resolved conflicts in the evidence in favor of the jury's verdict. *Id*. Similarly, we

presume that the trier of fact resolved any conflicting inferences in favor of the prosecution and must defer to that resolution. *Id*.

In Issue One, Appellant asserts the evidence was legally insufficient to support a conviction for capital murder in this case because there was no evidence to support that he struck the victim on the body with any object. Appellant contends that an officer had testified on cross-examination that there was no way of determining when Appellant's fingerprints got onto the handle of the blue tub, and that the evidence that Appellant at one point struck the victim was tainted because it was obtained through Belen's interview, which Appellant claims was influenced by the interviewer, Ms. Frescas.

The State may prove the defendant's identity and criminal culpability by either direct or circumstantial evidence, coupled with all reasonable inferences from that evidence. *Gardner v. State*, 306 S.W.3d 274, 285 (Tex.Crim.App. 2009). The standard of review in a legal sufficiency review is the same for both direct evidence and circumstantial evidence. *See Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007); *Arzaga v. State*, 86 S.W.3d 767, 777 (Tex.App.--El Paso 2002, no pet.). Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *See Johnson v. State*, 871 S.W.2d 183, 186 (Tex.Crim.App. 1993)("it is not necessary that every fact point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating circumstances"); *Barnes v. State*, 876 S.W.2d 316, 321 (Tex.Crim.App. 1994); *Alexander v. State*, 740 S.W.2d 749, 758 (Tex.Crim.App. 1987). Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence

alone can be sufficient to establish guilt. *Guevara v. State*, 152 S.W.3d 45, 49 (Tex.Crim.App. 2004).

Appellant was convicted of capital murder of a three-year-old child. A person commits the offense of capital murder if he commits the offense of murder as defined in Section 19.02(b)(1), and "the person murders an individual under six years of age." TEX.PEN.CODE ANN. § 19.03(a)(8)(West 2011). Paragraph A of the single-count indictment alleged that on or about November 19, 2007, Appellant "intentionally and knowingly cause[d] the death of . . . Jacqueline Gonzalez, by striking Jacqueline Gonzalez about the body with an unknown object, and the said Jacqueline Gonzalez was then and there an individual younger than six years of age," and Paragraph B alleged that Appellant "intentionally and knowingly cause[d] the death of . . . Jacqueline Gonzalez, by striking Jacqueline Gonzalez' body against an unknown object, and the said Jacqueline Gonzalez was then and there an individual younger than six years of age." At trial, the State argued that either Appellant or Ms. Perez killed the victim by his or her own conduct, or they acted together in commission. The court's charge accordingly instructed the jury on the law of parties.[5] When, as in this case, the trial court's charge authorized the jury to convict on more than one theory, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories. *Guevara*, 152 S.W.3d at 49; *Rabbani v. State*, 847 S.W.2d 555, 558 (Tex.Crim.App. 1992).

---

[5] We note that the application paragraph did not refer to the law of parties, or apply that law to the facts in the instant case, but the sufficiency of evidence supporting a conviction is to be measured against the hypothetically correct jury charge. *See Malik v. State*, 953 S.W.2d 234, 239-40 (Tex.Crim.App. 1997). Here, the hypothetically correct jury charge applies the law of parties to the facts in the application paragraph. *See Quiroz v. State*, No. 08-03-00484-CR, 2005 WL 2402499, at *4 (Tex.App.--El Paso Sep. 29, 2005, no pet.)(op., not designated for publication).

After reviewing the record, we conclude that viewing the evidence under the appropriate standard, the evidence was legally sufficient to find beyond a reasonable doubt that Appellant killed the victim as a primary actor. Evidence showing a consciousness of guilt may be one of the strongest indicators of guilt. *Johnson v. State*, 234 S.W.3d 43, 55 (Tex.App.--El Paso 2007, no pet.); *Torres v. State*, 794 S.W.2d 596, 598 (Tex.App.--Austin 1990, no pet.). Any conduct on the part of a person accused of a crime subsequent to its commission, which indicates a "consciousness of guilt" may be received as a circumstance tending to prove that he committed the act with which he is charged. *Torres*, 794 S.W.2d at 598. Although fingerprints standing alone do not sufficiently establish a defendant's identity as the killer, they constitute circumstantial evidence of his guilt. *See Clayton v. State*, 235 S.W.3d 772, 779 (Tex.Crim.App. 2007). Further, a defendant's failure to contact the police and attempt to conceal the victim's body may be relevant to the question of his consciousness of guilt, or lack thereof, and his overall mental state. *See Lee v. State*, 866 S.W.2d 298, 302 (Tex.App.--Fort Worth 1993, pet. ref'd). A defendant's false statements to cover up crime is evidence indicating a consciousness of guilt, and is admissible to prove the commission of the offense. *King v. State*, 29 S.W.3d 556, 565 (Tex.Crim.App. 2000). Evidence of flight indicates a consciousness of guilt. *See Clay v. State*, 240 S.W.3d 895, 905 n.11 (Tex.Crim.App. 2007). Moreover, evidence of a defendant's nervous and evasive behavior may show a consciousness of guilt. *Lassaint v. State*, 79 S.W.3d 736, 744 (Tex.App.--Corpus Christi 2002, no pet.). Finally, Texas case law is replete with holdings that when an adult defendant has had sole access to a child at the time the child sustained her injuries, the evidence is sufficient to support a conviction for injury to a child, or murder if the child dies. *See Garcia v. State*, 16 S.W.3d 401, 405 (Tex.App.--El Paso 2000, pet ref'd).

-10-

Appellant babysat the victim and had sole access to her from 7:30 or 8 a.m. until Ms. Perez returned home from work at 2 or 3 p.m. The victim was running and playing in the parking lot of the apartment complex at 5 p.m. that day. After Ms. Perez returned, the victim became ill and threw up. Between 6 and 7 p.m., Ms. Castaneda attempted to call Appellant, but either did not get an answer, or was not permitted to speak to him. At 8:45 or 9 p.m., either Appellant or Ms. Perez called Ms. Castaneda, and informed her that the victim had fallen, and was not breathing, and that they were unsure as to whether she was still alive or dead at the time. According to Belen, Appellant at some point that night called Ms. Castaneda to tell her that the victim was dying.[6] Between 9 and 11 p.m., neither the Appellant nor Ms. Perez called 911, or attempted to obtain medical assistance for the victim, who was lying on the floor at that point. Ms. Castaneda eventually called 911 at 11 p.m. and reported that the victim was not breathing, and possibly dead. Ms. Castaneda reported to the 911 dispatcher that Appellant and Ms. Perez were threatening to kill themselves because of what happened to the victim.

Shortly after 11 p.m. that night, officers arrived at the reported apartment, knocked on the door and asked for the inhabitants to open the door, but neither Appellant nor Ms. Perez answered, even though they were both inside, and Ms Perez had seen the officers. Appellant lied to the officers about why he did not answer the door. Appellant appeared nervous, evasive, and seemed as if he was getting ready to flee the scene. When the officers asked Appellant where the little girl was, Appellant directed them to the apartment's bedroom, where Belen was with

---

[6] Despite Appellant's contention that Ms. Frescas influenced Belen's responses in her interview, Ms. Frescas explained at trial that she did not tell Belen what to say, that she did not introduce or give any false memories to Belen during the interview, and that she was simply trying to clarify answers the five-year-old had provided.

Ms. Perez.  When the officers realized that the victim was still not accounted for, and asked

Appellant again where she was, he gave conflicting answers that she was either with her

grandmother or biological father.  Appellant had the keys to Ms. Perez's vehicle in his pocket.

After the officers retrieved the keys from his pocket, and opened the trunk of the vehicle with the

keys, they discovered the victim's bruised, dead body in a blue tub.  According to the paramedic

who arrived on the scene to assist, the victim had been dead for a few hours by the time her body

was discovered.  The fatal injuries were estimated to have been inflicted upon the victim between

8 and 9 p.m.  Appellant's fingerprints were found on the tub containing the victim's body.

According to Belen and the victim's paternal grandmother, Appellant previously hit both the

victim and Belen on many occasions, and both girls were afraid of Appellant.  Shortly after his

arrest, Appellant said to Ms. Perez, "I'm sorry for what I'm putting you through."

Based on our review of the record, Appellant's fingerprints on the blue tub in which the

victim's body was discovered, his failure to call 911 to obtain assistance, his lies to the officers

regarding the location of the victim after they arrived at the crime scene, his nervous and evasive

demeanor, his appearance of preparing to flee the crime scene when the officers arrived, and his

access to the victim at the time she sustained the injuries all constitute circumstances indicating

his consciousness of guilt.  *See Clayton*, 235 S.W.3d at 779; *Clay*, 240 S.W.3d at 905 n.11; *King*,

29 S.W.3d at 565; *Lassaint*, 79 S.W.3d at 744; *Garcia*, 16 S.W.3d at 405; *Lee*, 866 S.W.2d at

302.  Appellant's threats to kill himself and later apology to Ms. Perez for what he put her

through also indicated a consciousness of guilt.  *See Johnson v. State*, 208 S.W.3d 478, 500

(Tex.App.--Austin 2006, pet. ref'd)(evidence that defendant suffered an emotional breakdown

after her husband's murder and threatened to commit suicide was a relevant circumstance

indicating defendant's consciousness of guilt); *Ward v. State*, No. 05-09-00804-CR, 2010 WL 1224376, at *4 (Tex.App.--Dallas Mar. 30, 2010, no pet.)(op., not designated for publication) (evidence that defendant initially lied about the theft of his boss's property, but later apologized to the victim showed a consciousness of guilt, which supported the defendant's theft of property conviction).

The evidence presented at trial was sufficient to allow a jury to reasonably infer that Appellant put the victim's body into the tub, carried it to Ms. Perez's vehicle, placed it in the trunk, and intended to dispose of the body. Viewing the evidence in the light most favorable to the verdict, the jury's conclusion that it was Appellant, and not Ms. Perez, who killed the victim was reasonable. *See Clayton*, 235 S.W.3d at 779 (when presented with two conflicting theories, it is the jury's duty to resolve the conflict by assessing the credibility of the evidence raising the conflicting theories); *Goodman v. State*, 66 S.W.3d 283, 286 n.4 (Tex.Crim.App. 2001)(where the evidence is sufficient to allow for a reasonable conclusion of guilt, such finding by the jury must be upheld even if a different conclusion might also be reasonably supported). As the fact finder, the jury was free to disbelieve any contradicting testimonies presented by the defense witnesses. *See Chambers v. State*, 805 S.W.2d 459, 461 (Tex.Crim.App. 1991)(as the fact finder, jury is entitled to judge credibility of witnesses, can choose to believe all, some, or none of the testimony presented by the parties). Taking the evidence in the light most favorable to the verdict, we determine that a rational trier of fact could find beyond a reasonable doubt that Appellant was guilty of capital murder as a primary actor.

Even if the evidence was legally insufficient to convict Appellant guilty of capital murder as a primary actor, we determine that the evidence was legally sufficient to support his conviction

as a party. The law of parties provides that "[a] person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense." TEX. PEN.CODE ANN. § 7.02(a)(2)(West 2011). Evidence is sufficient to convict under the law of parties where the defendant is physically present at the commission of the offense, and encourages its commission by words or other agreement. *Salinas v. State*, 163 S.W.3d 734, 739 (Tex.Crim.App. 2005). Party participation may be shown by events occurring before, during, and after the commission of the offense, and may be demonstrated by actions showing an understanding and common design to do the prohibited act. *Id*. at 739-40.

Viewing in the light most favorable to the verdict, the evidence showed that Appellant lied to the police officers at the scene, which constituted a circumstance supporting a finding that he participated in the crime. *See Guevara*, 152 S.W.3d at 50-2 (defendant's false statements to authorities supported finding of guilt as party). The evidence also allowed the jury to infer that Appellant attempted to dispose of the victim's body so as to conceal evidence of the crime, another circumstance supporting the finding that he participated in the crime. *See Guevara*, 152 S.W.3d at 51-2 (defendant's retrieval of shell casings from crime scene and attempt to conceal them supported finding of guilt as party to the crime). Other circumstances to support his participation in the crime included Appellant's nervousness, evasiveness, the appearance that he was about to flee the scene of the crime shortly after the authorities arrived, and his failure to call 911 when he knew that the victim was dying. *See Clay*, 240 S.W.3d at 905 n.11; *Lassaint*, 79 S.W.3d at 744; *Johnson*, 208 S.W.3d at 500; *Lee*, 866 S.W.2d at 302; *Ward*, 2010 WL 1224376, at *4. Moreover, the evidence established that Appellant and Ms. Perez had histories of

-14-

physically abusing the victim, that Appellant knew of Ms. Perez's abuse of the victim but did nothing to prevent it, that both individuals were present and had sole access to the victim when she died, and that neither summoned any medical assistance for the victim. Taken in the light most favorable to the verdict, a rational trier of fact could find beyond a reasonable doubt that Appellant was guilty of the capital murder as a party by encouraging, aiding, or attempting to aid Ms. Perez in killing the victim. As such, the evidence was legally sufficient under the law of parties theory. Accordingly, we overrule Issues One and Two.

In Issue Three, Appellant argues the trial court erred by not suppressing the evidence found as a result of the warrantless search of Ms. Perez's vehicle. A trial court's ruling on a motion to suppress is reviewed under a bifurcated standard. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex.Crim.App. 2000). The reviewing court gives almost total deference to the trial court's ruling on questions of historical fact and application-of-law-to-fact questions that turn on an evaluation of credibility and demeanor. *Johnson v. State*, 68 S.W.3d 644, 652–53 (Tex.Crim.App. 2002). Questions of law, such as a trial court's determination of reasonable suspicion or probable cause, remain subject to *de novo* review. *State v. Garcia–Cantu*, 253 S.W.3d 236, 241 (Tex.Crim.App. 2008). When the trial court files findings of fact and conclusions of law that implicitly accept the State's version of events and find the detaining officer's testimony credible, the only question remaining for this Court is to determine whether the trial court properly applied the law to those facts. *See State v. Ballman*, 157 S.W.3d 65, 69 (Tex.App.--Fort Worth 2004, pet. ref'd).

Appellant contends that while the trial court held that he consented to the search of the vehicle, he provided that consent while he was in handcuffs, and was not free to leave. He

claims that the State did not prove he gave consent voluntarily while being handcuffed, and was questioned about the victim's whereabouts. He asserts that none of the exceptions to a search warrant requirement existed in this case.

The State argues that Appellant failed to establish his standing to contest the search of the vehicle because it belonged to Ms. Perez, and he was neither an owner nor an occupant of it. The State further argues that even if he did have standing to contest, the search was proper under the emergency doctrine and consent exceptions to the warrant requirement.

At the pretrial hearing on Appellant's motion to suppress evidence of the search, Appellant testified the police officers handcuffed him immediately upon entering the residence, and that they searched Ms. Perez's vehicle after obtaining the vehicle's keys from him. He testified that he had access to the vehicle and was allowed to drive it, with or without Ms. Perez, for a period of about two or three months. On direct-examination, he testified that nobody asked for his permission to obtain the keys in his pocket for accessing the vehicle, and that he did not sign any documents permitting them to do so. On cross-examination, he testified the vehicle's title was solely in Ms. Perez's name. The trial court indicated on the record that it did not "believe that [Appellant had] standing to challenge the search of that vehicle," but it did not rule on the standing issue at that time. At the conclusion of the hearing, however, the trial court took Appellant's motion to suppress under advisement. The trial court later signed a written order denying the motion to suppress. The court subsequently entered written findings of fact and conclusions of law. The court made the finding that Ms. Perez, and not Appellant, owned the vehicle in question, and that Appellant provided consent for its search. The court further made these conclusions of law:

1.      That the Defendant Francisco Castaneda is not the owner of the vehicle that was searched, that he further does not have any financial interest in the vehicle that was searched and does not therefore have Standing to complain of the search.

2.      That even if Defendant Francisco Castaneda does enjoy Standing to complain about the legality of the search of the Dodge Stratus vehicle, he voluntarily consented to a search of the Dodge Stratus vehicle by Officer Gonzalez. Officer Harrison was present and heard the Defendant consent to a search of the vehicle.

3.      That Officer Gonzalez was acting in a community caretaking role to protect or preserve life when he searched the Dodge Stratus vehicle and under the Emergency Doctrine the search was legal.

Appellant concedes that as the defendant, he has the burden to establish standing to object to a search, and that a non-owner passenger does not have standing to challenge the search of a vehicle's trunk. However, he cites to cases such as *State v. Allen* for the proposition that a non-owner who is the sole occupant and driver of a vehicle with the owner's permission has standing to so challenge. *See, e.g., State v. Allen*, 53 S.W.3d 731, 733 (Tex.App.--Houston [1st Dist.] 2001, no pet.). He asserts that the question in this case is whether a non-owner driver has standing when the owner is also present but in a different room.

In *Allen*, the officers conducted a search of the defendant's vehicle where he was the driver but non-owner, and his girlfriend was the vehicle's owner but only a passenger at the time of the stop. *Id*. at 732. The appellate court in that case recognized that the facts of that case fell between two lines of cases in which the law of standing was clear: while a non-owner passenger did not have standing to challenge a search of the vehicle's trunk, a non-owner who was the sole occupant and driver of a vehicle with the owner's permission did have standing. *Id*. at 732. In determining the issue on whether a non-owner driver had standing when the owner was also

-17-

present, the Houston court referred to decisions from the federal circuit courts, which denied

standing to a defendant in Appellee's position, noting:

> A nonowner driving alone stands in the shoes of the owner. No one else is present to prevent access to any part of the car, or to object to an improper search by the police. But if the owner is present, she may grant or deny access to the nonowner or the police. Undoubtedly, some owners may grant permission to co-occupants to exercise these rights. But the same might be said of passengers, and the law is clear they have no standing. If nonowner passengers have no legitimate expectation of privacy with respect to an automobile's trunk, we do not see how that expectation changes when they change seats.

*Id*. at 733.

Here, Appellant appears to contest that his case is different from that of *Allen* because

Ms. Perez, the owner of the vehicle, was in a different room and not "present" when the officers

took the keys from Appellant for the vehicle's search. However, we determine that the facts of

his case is incomparable to *Allen* and the other cases he cited because in those cases, even though

the defendants were the non-owners of the searched vehicle, they were all occupants of the

vehicle at the time of the search. *See Flores v. State*, 871 S.W.2d 714, 719-20 (Tex.Crim.App.

1993); *Allen*, 53 S.W.3d at 732; *State v. Johnson*, 896 SW.2d 277, 285 (Tex.App.--Houston [1st

Dist.] 1995), *aff'd*, 939 S.W.2d 586 (Tex.Crim.App. 1996); *Nite v. State*, 882 S.W.2d 587, 588-

591 (Tex.App.--Houston [1st Dist.] 1994, no pet.). The record in the present case indicates that

Appellant was neither an owner nor an occupant of the vehicle at the time of the search. As such,

we conclude Appellant did not have standing to challenge the vehicle's search. Accordingly, he

has failed to establish that the trial court erred in denying the motion to suppress because he

lacked standing to make this challenge. Issue Three is overruled.

In Issue Four, Appellant argues the trial court erred by admitting the recorded interview of Belen because her statements in the interview were "testimonial," and so the admission of these statements violated his constitutional rights to confront and cross-examine his witnesses. Appellant challenges the constitutionality of Texas Code of Criminal Procedure article 38.071 on its face and as applied, asserting that "in the wake of *Crawford*, the procedural outcry statute destroys a defendant's right to confrontation under both the Sixth Amendment to the United States Constitution as well as Article I, section 10 of the Texas Constitution." Generally, we review a trial court's decision on the admission of evidence under an abuse-of-discretion standard. *Miller v. State*, 36 S.W.3d 503, 507 (Tex.Crim.App. 2001); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990)(op. on reh'g). But when deciding whether the admission of certain statements violated a defendant's right to confrontation, we review the trial court's ruling *de novo*. *Wall v. State*, 184 S.W.3d 730, 742-43 (Tex.Crim.App. 2006).

The admission of out-of-court statements violates the Confrontation Clause if the statements were made by an absent declarant and were testimonial in nature. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004); *King v. State*, 189 S.W.3d 347, 358 (Tex.App.--Fort Worth 2006, no pet.). In general, statements are testimonial only when "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822, 126 S.Ct. 2266, 2274, 165 L.Ed.2d 224 (2006). Whether a statement is testimonial is determined on a case-by-case basis, using the perception of an objectively reasonable declarant. *Wall*, 184 S.W.3d at 742-43.

Appellant contends that because he was only permitted by the trial court to cross-examine Belen's videotaped statements through written interrogatories, he was denied his rights to face-to-face confrontation and cross-examination, as guaranteed by the Sixth Amendment. Appellant concedes that he had the opportunity to submit questions to the child through the use of written interrogatories, but he asserts that such a procedure was futile because "any subsequent questioning would not reveal the child's demeanor which might have been beneficial to the defendant." He contends the trial court should have considered less restrict alternatives to the use of written questions in lieu of live, face-to-face cross-examination. Appellant argues that the trial court's determination that the child was unavailable was based on the sole testimony of the child's father, "who was not a physician or psychologist, and who would be clearly biased against any possibility that the child would have to testify live in the appellant's trial."

The State responds to Appellant's arguments by asserting that he failed to preserve this challenge because he did not specifically raise it at trial, and he did not take advantage of the written interrogatory method of cross-examination as provided by Article 38.071.

As a prerequisite to presenting a complaint for appellate review, Appellant must present to the trial court a timely request, objection, or motion stating the specific grounds for the desired ruling. TEX.R.APP.P. 33.1(a)(1)(A); *Rhoades v. State*, 934 S.W.2d 113, 120 (Tex.Crim.App. 1996); *Casteneda v. State*, 135 S.W.3d 719, 723 (Tex.App.--Dallas 2003, no pet.). Constitutional rights may be waived by the failure to object. *Rhoades*, 934 S.W.2d at 120; *Curry v. State*, 910 S.W.2d 490, 496 (Tex.Crim.App. 1995); *Casteneda*, 135 S.W.3d at 723.

Prior to trial, the State filed a written notice of its intent to offer Belen's video-recorded statement into evidence. Appellant filed no written objections to this notice, but at the pretrial

-20-

hearing on the statement's admissibility, Appellant's trial counsel objected that Article 38.071 did not apply to Belen, stating: "[W]e object on the grounds that this provision applies to children who are victims of the offense. It's right there in the title of the section 37 – 38.071, and that is the testimony of a child who is a victim of offense. This child is not the victim of the offense. She's a witness, and therefore this does not apply to her." Ms. Frescas subsequently testified regarding her qualifications. Mr. Noe Gonzalez, the father of Belen, then testified. He testified that Belen was seven years old, had been living with him for two years since 2007, and that prior to that, he had visitation rights with her. He testified that Ms. Perez was Belen's mother, and that Appellant was Ms. Perez's boyfriend. According to Mr. Gonzalez, both Belen and Belen's half-sister, the victim, lived with Ms. Perez and Appellant. After the incident occurred, Mr. Gonzalez took custody of Belen, and took her back to Las Vegas with him, where he lived. He testified that since the incident, Belen has felt close to his family in Las Vegas, her emotional state has stabilized, but that she was generally afraid of males, and that she was traumatized when she had to discuss the incident involving Jacqueline. Mr. Gonzalez believed it would be detrimental to Belen to have her face Appellant if she were to testify in Appellant's presence. The trial court determined that Belen was unavailable to testify based on the following factors:

> First, the relationship of the Defendant in this case to the child. And certainly I find that there is a relationship. It appears to me that she referred to him as dad prior to the involvement of her real father in any significant capacity in her life.
> The nature and the duration or the character of the alleged offense, capital murder, certainly comes into play with respect to this section. I find that the young age, maturity level, and limited emotional stability of the child all come into play and are factors in this determination. She was five at the time of the offense and is seven now. Two years have elapsed since the alleged offense.

I find that emotionally she is not capable of confrontation with the Defendant in this case under subsection 8(a)1, and that she would suffer undue psychological harm through any involvement in this proceeding.

The trial court authorized defense counsel to draft interrogatories to Belen. However, the record does not reveal any such interrogatories, and Appellant acknowledged on appeal that he did not take advantage of this opportunity to present such interrogatories.

At trial, when the State offered Exhibit No. 141, Belen's video-recorded statement, into evidence, Appellant reurged the same objections he had made at the pretrial hearing. When the State offered Exhibit No. 144, the written translation of Belen's statement, into evidence, Appellant again reurged his objections from the pretrial hearing. The trial court overruled Appellant's objections in both instances.

Based on our review of the record, Appellant did not raise his constitutional challenges to Belen's recorded interview at trial, and so he failed to preserve these claims for our review. *See* TEX.R.APP.P. 33.1(a)(1)(A); *Rhoades*, 934 S.W.2d at 120; *Curry*, 910 S.W.2d at 496 *Casteneda*, 135 S.W.3d at 723. Accordingly, we overrule Issue Four.

Having overruled Appellant's issues presented for review, we affirm the trial court's judgment.


September 28, 2011

DAVID WELLINGTON CHEW, Chief Justice

Before Chew, C.J., McClure, and Rivera, JJ.

(Do Not Publish)

-22-