IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






No. PD-1370-05






WILLIE ALLEN CLAY, Appellant



v.



THE STATE OF TEXAS






ON THE STATE'S PETITION FOR DISCRETIONARY REVIEW AND
DISCRETIONARY REVIEW ON THE COURT'S OWN MOTION

IN CAUSE NO. 01-03-01223-CR FROM THE FIRST COURT OF APPEALS

HARRIS COUNTY





 Holcomb, J., delivered the opinion of the Court, in which Keller, P.J.,
and Johnson, Keasler, Hervey, and Cochran, JJ., joined. Price and
Womack, JJ., dissented. Meyers, J., did not participate.



 The trial court admitted certain hearsay testimony over appellant's objection that its admission
would violate his Sixth Amendment right to confront the witnesses against him. On direct appeal, the court
of appeals held that the trial court erred in admitting the testimony and that the error was not harmless
beyond a reasonable doubt. We now reverse.

 On July 14, 2003, a Harris County grand jury returned an indictment charging appellant with
aggravated robbery under Texas Penal Code §§ 29.02(a)(2) and 29.03(a)(2). (1) On November 17, 2003,
the State brought appellant to trial before a petit jury on his plea of not guilty. At the guilt stage of the trial,
the State called six witnesses: Amber Trevino (the complainant), Monica Duran, Marina Lopez, Jose
Mireles, Sara Magnero, and John Clinton. Appellant did not testify, and he called no witnesses.

 Amber Trevino testified that: (1) she was a cocktail waitress at the "M Bar" nightclub in Houston;
(2) on the night of June 21-22, 2003, she finished her work at the nightclub at around 3:00 a.m., as usual,
and then drove her car, a Toyota Corolla, to her boyfriend Derrick's townhouse; (3) the townhouse was
located on Hawthorne Street, in Houston, near the intersection of Hawthorne and Yupon; (4) she parked
her car on Yupon Street, got out, locked the car, crossed Yupon, and walked toward the townhouse,
carrying her purse and overnight bag with her; (5) after she crossed Yupon, she sensed someone running
up behind her; (6) she started to turn and was attacked by three men; (7) one of the assailants beat her
head and body savagely with a club, as if trying to kill her, and the other two hit and kicked her with their
hands and feet; (8) the two assailants who hit and kicked her wrested her purse and bag away from her
and then ran to her car; (9) the assailant with the club remained behind and beat her for approximately five
minutes, terrifying her and making her fear for her life, until a neighbor, who had heard Trevino's screams,
came outside and yelled "Stop!", at which time that assailant, too, ran away; (10) once the attack was over,
Trevino got up, ran to her boyfriend's townhouse, and went inside; (11) when she left the townhouse later
to be taken to a local hospital, her car was gone; (12) a few days after the attack, she viewed a police
photospread containing photographs of six young African-American men and, with complete certainty, she
identified appellant as the assailant who beat her with a club; and (13) at some point thereafter, she
attended a police lineup and identified Larry Monroe and Chad Ivy as the other two assailants. Trevino
testified further that: (14) the lighting in the area of the attack, from street lights and house lights, was
adequate for her to see her assailants' faces; (15) she got a "good look" at their faces, even though, in the
course of the attack, she fell to the ground and "curled up" to protect herself; (16) in particular, she had
"plenty" of opportunity to see the face of the assailant wielding the club; and (17) she had "no doubt" that
appellant was the assailant with the club and that Monroe and Ivy were the two who hit and kicked her. (2) 
Finally, Trevino also testified that: (18) the attack left her with a severe laceration to her scalp, which
required staples to close; torn muscles and a blood clot in one leg; bruises all over her head and body;
depression; and difficulty sleeping; (19) she did not suffer a concussion, however; (20) she was twenty-two
years old and had a "very busy" schedule, working at the "M Bar" nightclub on Wednesdays and
Saturdays, working at a clothing store on Mondays, Wednesdays and Fridays, and attending two different
schools on Tuesdays and Thursdays; (21) she wore eyeglasses to read but did not need them to see
people's faces; and (22) she testified at the trial of Monroe and Ivy and, while there, she saw appellant in
orange dungarees.

 Monica Duran testified that: (1) she resided with her brother, Derrick, in a townhouse on
Hawthorne Street in the Montrose area of Houston; (2) on the night of June 21, 2003, she and three friends
spent a couple of hours drinking at the "M Bar" nightclub in Houston, where another friend, Amber
Trevino, worked as a cocktail waitress; (3) she and her three friends left the nightclub just before 2:00 a.m.
and drove to her townhouse, arriving there around 2:15 a.m.; (4) as they parked their vehicle, in a well-lit
area across from the townhouse, she noticed three men walking by, one of whom carried a club; (5) the
three men "turned around and started following" her and her friends when they got out of their vehicle; (6)
fearful that the three men "were up to no good," she hurried her friends into the townhouse; (7) a short
while later, while she was upstairs in the townhouse, she "heard a horrible scream"; and (8) she then ran
downstairs and found Trevino in a hallway, very bloody and "crying hysterically."

 Marina Lopez testified that: (1) on the night of June 21, 2003, she accompanied Monica Duran and
two others to the "M Bar" nightclub; (2) while at the nightclub, she drank two margaritas; (3) when she and
the others left the nightclub, they drove to Duran's townhouse on Hawthorne Street; (4) they parked their
vehicle directly across from the townhouse; (5) as they parked, she saw three men walking down the side
of the street, facing their vehicle and looking at them; (6) as she and the others got out of their vehicle, the
three men, who had passed their vehicle, stopped about ten feet away, turned around, and looked at them;
(7) at that point, she was afraid that "something was going to happen"; (8) she and the others then hurried
into the townhouse; (9) the lighting in the area was adequate for her to see the faces of the three men "pretty
well"; (10) she was certain that appellant was one of the three men; (3) and (11) at some point after June 26,
2003, she identified, for the police, Monroe and Ivy as the other two men.

 Jose Mireles testified that: (1) he was a Houston police officer assigned to the night shift; (2) on
June 26, 2003, while patrolling the Montrose area of Houston, he encountered a maroon Toyota Corolla
going the wrong way down a one-way street; (3) at that time, the Toyota was approximately one-quarter
mile from the intersection of Hawthorne and Yupon Streets; (4) he activated his patrol car's siren and
overhead lights, but the Toyota sped away; (5) the driver of the Toyota then led him on a high-speed chase
through Montrose until the Toyota crashed into a telephone pole; (6) he saw three individuals emerge from
the Toyota and flee; (7) he pursued the driver, later identified as Larry Monroe, and caught him a short
distance away; (8) other police officers, using police dogs, located the others who fled, later identified as
appellant and Chad Ivy; and (9) a subsequent check of a law-enforcement data base revealed that the
Toyota in question had been stolen in an aggravated robbery.

 Sara Magnero testified that: (1) she resided in an apartment complex in the Montrose area of
Houston; (2) on June 26, 2006, she was awakened in "the middle of the night" by the sound of police
sirens; (3) she looked out the front door of her apartment and saw "two gentlemen hiding between the wall
[of the parking lot] and one of the parked cars"; (4) she got a good look at the two men, who were
"crouched down" and "looking nervous"; (5) the two men were appellant and Chad Ivy; (4) (6) she
telephoned the police and reported what she had seen; (7) she then left her apartment, walked out to the
street, and saw that a "car had run into a pole and there was a police car behind it"; (8) she told police
officers at the scene about the two men she had seen hiding; and (9) those officers, using police dogs,
located the two men she had seen.

 John Clinton testified that: (1) he was a Houston police officer; (2) he was assigned to investigate
the June 22, 2003, aggravated robbery of Amber Trevino; (3) on June 26, 2003, he showed Trevino a
photospread containing photographs of six young African-American men, and Trevino, with complete
certainty, identified appellant as one of her assailants; (4) the license plate on Trevino's Toyota matched
the license plate on the Toyota that Monroe crashed on June 26, 2003; (5) he interviewed Monroe and
Ivy separately after they were arrested, and both men confessed to being involved, along with appellant,
in the robbery of Trevino. (5), (6) Clinton's testimony continued:

 Q: As you were talking to Mr. Monroe and he was telling you what he and Mr. Ivy and
Mr. Clay did on June 22, 2003, what did he tell you their plan was that night?

 

 

 A: To rob somebody and steal their vehicle.

 

 * * *


 

 Q: And Monroe indicated to you that he and Mr. Ivy and Mr. Clay were all in on that plan,
weren't they?

 

 A: Yes, ma'am.

 

 * * *


 

 Q: What specifically were they doing leading up to the robbery on June 22, 2003?

 

 A: Mr. Monroe found a nightstick in the bushes.

 

 * * *


 

 Q: Okay. And what did he do with the nightstick?

 

 A: He gave it to Willie.

 

 Q: And how long did they walk around with that nightstick looking for a victim?

 

 A: For a while.

 

 Q: And did they tell you what part of town they were walking around in with that
nightstick?

 

 A: Around the complainant's house, around the neighborhood.

 

 Q: And what neighborhood is that?

 

 A: Montrose.

 

 Q: Okay. When you talked to Mr. Ivy, did he indicate anything about the plan on June 22,
2003?

 

 A: He pretty much gave the same type of statement and corroborated what Mr. Monroe
was telling me.

 

 Q: And he did that independently of Mr. Monroe, didn't he?

 

 A: Yes, ma'am.

 

 Q: He told you the three of them were together and had a plan?

 

 A: Yes, ma'am.

 

 Q: Did he indicate what that plan was?

 

 A: They were looking for somebody to rob and get the vehicle.

 

 Q: Did they indicate to you that that's what they did?

 

 A: Yes, ma'am.

 

 * * *


 

 Q: Officer, when you questioned both Mr. Monroe and Mr. Ivy independently, did Mr.
Monroe put himself at the scene of Amber Trevino's robbery over on Hawthorne Street?

 

 A: Yes, ma'am.

 

 Q: Did he also indicate that Chad Ivy was there at Ms. Trevino's robbery?

 

 A: Yes, ma'am.

 

 Q: And did he also indicate that Willie Clay was there at Ms. Trevino's robbery?

 

 A: Yes, ma'am.

 

 Q: And did Mr. Ivy indicate the same things, that the three of them, Mr. Clay, Mr.
Monroe, and Mr. Ivy were all present over there on Hawthorne Street at Ms. Trevino's
robbery?

 

 A: Yes, ma'am.

 

 Q: Did Mr. Monroe and Mr. Ivy also both indicate that they got in that maroon Toyota
Corolla, all three of them, and left the scene of that robbery that night, June 26th [sic]?

 

 A: Yes, ma'am.

 

 Q: And did they indicate that they spent the next three days together, all three of them?

 

 A: Yes, ma'am.

 

 Q: And did they indicate to you that they were together up until the time Officer Mireles
pulled them over [sic] during that police chase?

 

 A: Yes, ma'am.


 The jury charge, in accord with the indictment, (7) authorized the jury to convict appellant of
aggravated robbery, either as a principal or as a party, under Texas Penal Code §§ 7.02(a)(2),
29.02(a)(2), and 29.03(a)(2):

 "Now, if you find from the evidence beyond a reasonable doubt that on or about
the 22nd day of June, 2003, in Harris County, Texas, the defendant, Willie Allen Clay, did
then and there unlawfully, while in the course of committing theft of property owned by
Amber Trevino and with intent to obtain or maintain control of the property, intentionally
or knowingly threaten or place Amber Trevino in fear of imminent bodily injury or death,
and the defendant did then and there use or exhibit a deadly weapon, to-wit: a club; or if
you find from the evidence beyond a reasonable doubt that on or about the 22nd day of
June, 2003, in Harris County, Texas, Larry Monroe and/or Chad Ivey [sic], did then and
there unlawfully, while in the course of committing theft of property owned by Amber
Trevino and with intent to obtain or maintain control of the property, intentionally or
knowingly place Amber Trevino in fear of imminent bodily injury or death, and Larry
Monroe and/or Chad Ivey did then and there exhibit a deadly weapon, to-wit: a club, and
that the defendant, Willie Allen Clay, with the intent to promote or assist the commission
of the offense, if any, solicited, encouraged, directed, aided or attempted to aid Larry
Monroe and/or Chad Ivey to commit the offense, if he did, then you will find the defendant
guilty as charged in the indictment."


 In its closing argument at the guilt stage, the State focused on the testimony of Trevino, Lopez, and
Mireles, and made but two brief references to Clinton's testimony concerning what Monroe and Ivy told
him. 

 In his closing argument at the guilt stage, defense counsel argued that the State's case was based
on unreliable eyewitness identification:

 "One of the witnesses, Ms. Garcia [sic], testified she got out of the car, and she
said that she saw my client, Mr. Clay. I asked her had they been drinking?

 "She said, yes, they had.

 "How long had they been drinking?

 "Several hours.

 "How much had they had to drink?

 "Oh, a few drinks.

 "And then, I think, perhaps it dawned on her that I was trying to ask the question
how reliable her identification was. She said, we just had two drinks. They were
margaritas.

 "I want to ask you to consider the fact that we are talking about, quite possibly,
inebriated witnesses on a dark, dark street at 3:00 in the morning over in Montrose. And
I also want to ask you to recall the confidence for [sic] which both she and the complaining
witness identified my client . . . when they testified on the stand here.

* * *


 "[T]his woman [Trevino] was exhausted, I think we can say, you can infer from
her schedule, from having two jobs and going to two schools, who is still out at work, in
essence, at 3:00 in the morning, fatigued already before being attacked, somebody comes
up behind her and bops her over the head and continues to bop her over the head on a
dark night. She puts her hands up to protect herself. She falls to the ground. She says she
curled up in a fetal position, and she wears glasses. She wears glasses for reading. And
yet, despite all that, she was able to absolutely claim with a clear conscience that she was
positive about her identification.

 "Ladies and gentlemen, just from the evidence that the State's witnesses have given
you, I think there is sufficient reason for you to have a reasonable doubt about the
accuracy of her identification.

 "Now, what else don't we have besides an identification that you can be confident
about? Also, by the way, remember that she [Trevino] admitted that . . . at the previous
trial of the other two boys, Mr. Clay was brought out in orange dungarees. He was the
only guy in the court with orange dungarees. Brought out in the courtroom and taken
back. If that wouldn't convince you that you were a hundred percent positive where
before you weren't quite so sure, I don't know what else would.

 * * *


 "Now, you . . . have a lady six months after this horrible event is still suffering from
the effects of a cranial trauma where blows to her head practically split her head open. I
would suggest to you that she is - the certainty of her identification - and I put it to you
very bluntly, that is simply not a reliable identification. Again, by saying that, I'm not in any
way trying to impugn her dignity or integrity as a person or anything else. I'm just saying
that I want you to use your common sense and human nature about what else might be
going on here."


 The jury rejected defense counsel's argument and found appellant guilty of aggravated robbery as
charged in the indictment.

 At the punishment stage of the trial, the State called a single witness, Amber Trevino, who testified
again concerning the extensive injuries she suffered as a result of appellant's blows. Appellant himself
called four witnesses - Mary Lou Ballew, Nina Cofer, Kim Goins, and Nyelene Qasem - each of whom
testified that she knew and had worked with appellant, and that she believed him to be a good candidate
for probation.

 In its closing argument at the punishment stage, the State asked the jury to assess appellant's
punishment at imprisonment for sixty years. The State did not refer to Clinton's testimony at any point
during its argument. In his closing argument at the punishment stage, defense counsel argued that the
evidence showed that appellant was a good candidate for probation.

 The jury again rejected defense counsel's argument and assessed appellant's punishment at
imprisonment for sixty years and a fine of $10,000.

 On direct appeal, appellant, citing Crawford v. Washington, 541 U.S. 36 (2004), argued that the
trial court violated his Sixth Amendment right to confrontation when it admitted Clinton's hearsay testimony
concerning what Monroe and Ivy told him. (8) Appellant also argued that the trial court's error was not
harmless beyond a reasonable doubt: (9)

 "[T]he error was clearly harmful. Mr. Clay's defense was predicated on the
inability of the witnesses to accurately perceive the events and defense counsel aggressively
sought to undermine their identification. He either elicited or attempted to elicit evidence
that some of the witnesses were intoxicated, that the area was too dark, that the victim
never saw her attackers before the assault and that the steps she took to protect herself
impaired her ability to identify Mr. Clay. He sought to show that the victim's injury also
rendered her less able to correctly identify her attacker . . . .

 * * *


 "[B]ecause the constitutional violation was used to rebut Mr. Clay's defense and
because the prosecution relied on it in asking the jury to convict Mr. Clay, this Court
cannot conclude beyond a reasonable doubt that the error did not contribute to Mr. Clay's
conviction."


 In its response brief, the State conceded that the trial court erred but argued that the error was
harmless because "the evidence of appellant's guilt was overwhelming":

 "Shortly before the attack, Marina [Lopez] saw appellant and his two accomplices
in the vicinity where the attack would occur. She got a good look at him and was certain
of her identification of appellant. Similarly, Amber [Trevino] got a good look at appellant
during the extended beating and she was absolutely certain of her identification of him. 
Amber also identified the same two men that Marina identified as appellant's accomplices. 
Three days later, appellant and the same two men were driving in Amber's stolen vehicle. 
When an officer stopped the car, the men fled, evincing a consciousness of guilt. While
Amber's and Marina's eyewitness identifications of appellant and his two codefendant's
[sic] were extremely compelling due to their absolute certainty, the fact that the same three
men were later found in Amber's stolen car renders the case against appellant practically
rock solid. To say the evidence of appellant's guilt is overwhelming under these
circumstances is almost an understatement." (Citations and footnotes omitted.)


The State also pointed out that, "although the prosecutor mentioned the codefendants' statements [to
Clinton] twice during her closing argument, she did not emphasize this evidence."

 The court of appeals, after a long analysis, agreed with appellant's arguments, sustained his point
of error, and reversed the judgment of the trial court. Clay v. State, 177 S.W.3d 486, 496 (Tex.App. -
Houston [1st Dist.] 2005). With respect to the harmfulness of the trial court's error, the court of appeals
summed up its reasoning as follows:

 "Though the State's properly admitted evidence against appellant was strong and
could likely support a guilty finding, we do not agree that it was 'overwhelming.' Rather,
Monroe's and Ivy's unchallenged statements, which served to incriminate appellant and
refute the defense's theory of eyewitness misidentification, was the most powerful and
persuasive evidence offered by the State. If we were to rule that the error of admitting
Monroe's and Ivy's statements were harmless, we would essentially be asserting that the
nature of that error is such that it could not have affected the jury in this case. This we
cannot do." Id. at 495.


 The State later filed a petition for discretionary review, which we granted and which presented as
its sole ground for review this question: "When conducting a harm analysis, must an appellate court consider
all the evidence in the record?" (10) In its petition and accompanying brief, the State reiterates the arguments
that it made below and argues further that "[t]he Court of Appeals erred in failing to consider all the
properly admitted evidence while conducting its harm analysis." In his response brief, appellant argues that
the court of appeals did not err in holding the trial court's error not harmless because "[t]he statements of
Monroe and Ivy [admitted via Clinton's testimony] served to establish that Mr. Clay used force with the
intent to commit theft [and] their statements rebutted his defense of mistaken identification."

 In Chapman v. California, 386 U.S. 18 (1967), the United States Supreme Court set forth the
test for determining whether a federal constitutional error is harmless. That test, the Court said, is whether
it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict
obtained." Id. at 24. Under Chapman, a federal constitutional error "did not contribute to the verdict
obtained" if the verdict "would have been the same absent the error." Neder v. United States, 527 U.S.
1, 15-18 (1999). The Chapman test is codified in Texas Rule of Appellate Procedure 44.2(a), which
provides that constitutional error requires reversal of the judgment "unless the court determines beyond a
reasonable doubt that the error did not contribute to the conviction or punishment."

 In our assessment of the likelihood that, absent the trial court's error, the jury verdicts as to
appellant's conviction and punishment would have been the same, we must consider the entire record. 
Neder v. United States, 527 U.S. at 15-16. Among the factors, as revealed by the record, that we must
consider are: (1) the importance of the hearsay evidence to the State's case; (2) whether the hearsay
evidence was cumulative of other evidence; (3) the presence or absence of other evidence corroborating
or contradicting the hearsay evidence on material points; and (4) the overall strength of the State's case. 
Davis v. State, 203 S.W.3d 845, 852 (Tex.Crim.App. 2006). We must also consider any other factor,
as revealed by the record, that may shed light on the probable impact of the trial court's error on the minds
of average jurors. Ibid.

 Setting aside Clinton's testimony concerning what Monroe and Ivy told him, the State's evidence
in this case, in summary, consisted of the following: (1) Trevino's testimony that, in the middle of the night
on June 22, 2003, near the intersection of Hawthorne and Yupon Streets in Houston, appellant, Monroe,
and Ivy attacked her and took her belongings, including her Toyota Corolla; (2) Trevino's testimony that,
of the three, appellant was the one who attacked her with a club, making her fear for her life and leaving
her seriously injured; (3) Trevino's testimony that she was certain of her identification of the three assailants;
(4) Duran's and Lopez's testimony that placed appellant, Monroe, and Ivy, all acting quite suspiciously,
in the vicinity of the attack on Trevino shortly before it occurred; (5) Lopez's testimony that she was certain
of her identification of appellant; (6) Mireles's testimony that, on June 26, 2003, he encountered a Toyota
Corolla going the wrong way down a one-way street just one-quarter mile from the scene of the attack on
Trevino; (7) Mireles's testimony that the driver of the Toyota led him on a high-speed chase through
Montrose, ending only when the Toyota crashed into a pole; (8) Mireles's testimony that he saw three
individuals, later identified as appellant, Monroe, and Ivy, flee from the Toyota after it crashed; (11) and (9)
Clinton's testimony that the Toyota from which appellant, Monroe, and Ivy fled was the one stolen from
Trevino. Although defense counsel, by his cross-examination, attempted to show that Trevino was fatigued
or otherwise unable to clearly see or remember her assailants, and that Lopez was intoxicated, there was,
in fact, no affirmative evidence adduced at trial to reasonably establish any of those things. We also note
that the prosecutor, during her closing argument at the guilt stage, made but two brief references to
Clinton's testimony concerning what Monroe and Ivy told him. 

 On this record, we are persuaded beyond a reasonable doubt that the jury's verdict as to
appellant's conviction would have been the same even if the trial court had not admitted Clinton's testimony
concerning what Monroe and Ivy told him. The State's case establishing appellant's guilt of aggravated
robbery, either as a principal or as a party, was straightforward and strong - unshakeable eyewitnesses
placing him in the vicinity of the crime and shortly thereafter at the scene of the crime itself, together with
other circumstances strongly indicating his guilt - and leaves us firmly convinced that in the absence of the
erroneously admitted testimony, a reasonable jury would not have found the State's case significantly less
persuasive.

 We are also persuaded beyond a reasonable doubt that the jury's verdict as to appellant's
punishment would have been the same even if the trial court had not admitted Clinton's testimony
concerning what Monroe and Ivy told him. (12) The erroneously admitted evidence established little, if anything, negative about appellant that was not also well established
by the properly admitted evidence.

 We reverse the judgment of the court of appeals and affirm the judgment of the trial court.


DELIVERED NOVEMBER 21, 2007

PUBLISH
1. The indictment alleged that appellant, in Harris County, "on or about June 22, 2003, did then
and there, while in the course of committing theft of property owned by AMBER TREVINO and with
intent to obtain and maintain control of the property, intentionally and knowingly threaten and place
AMBER TREVINO in fear of imminent bodily injury and death, and the [appellant] did then and there
use and exhibit a deadly weapon, to-wit: A CLUB."
2. The record reflects that Trevino identified appellant, Monroe, and Ivy in the courtroom as her
assailants.
3. The record reflects that Lopez identified appellant in the courtroom as one of the men she
saw on the night in question.
4. The record reflects that Magnero identified appellant and Ivy in the courtroom as the two
men she saw.
5. Clinton's testimony concerning what Monroe and Ivy told him was admitted over appellant's
running objection that its admission would violate his Sixth Amendment right to confront the witnesses
against him.
6. During appellant's trial, Monroe and Ivy were brought before the trial court outside the
presence of the jury. When asked whether they would testify, both men refused.
7. See footnote one, supra.
8. The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal
prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." 
This right was made applicable to state criminal prosecutions by the Due Process Clause of the
Fourteenth Amendment. Pointer v. Texas, 380 U.S. 400, 403 (1965). Under the Confrontation
Clause, a "testimonial" hearsay statement may not be admitted in evidence against an accused unless
the declarant is unavailable and the accused had a prior opportunity to cross-examine him. Crawford
v. Washington, 541 U.S. 36, 68 (2004). A statement given during police interrogation is "testimonial"
"when the circumstances objectively indicate that there is no . . . ongoing emergency, and that the
primary purpose of the interrogation is to establish or prove past events potentially relevant to later
criminal proceedings." Davis v. Washington, ___ U.S. ___, ___, 126 S.Ct. 2266, 2273-74 (2006).
9. A violation of the Confrontation Clause is subject to harmless error analysis. Delaware v.
Van Arsdall, 475 U.S. 673, 684 (1986).
10. We also granted review of this case on our own motion and asked the parties to brief us on
a second question: "What is the proper test for analyzing harm when considering the effects of the
erroneous admission of evidence barred by Crawford v. Washington?" This second question,
however, we subsequently answered in Davis v. State, 203 S.W.3d 845, 849-853 (Tex.Crim.App.
2006).
11. Evidence of flight evinces a consciousness of guilt. Fentis v. State, 582 S.W.2d 779, 780-781 (Tex.Crim.App. 1976).
12. Since the court of appeals did not address whether the trial court's error contributed to the
jury's verdict on punishment, we could properly remand the case to the court of appeals so that it might
address that question in the first instance. However, in the interest of judicial economy, we will perform
that harm analysis ourselves. See McNac v. State, 215 S.W.3d 420, 424 (Tex.Crim.App. 2007);
McDonald v. State, 179 S.W.3d 571, 579-580 (Tex.Crim.App. 2005) (Cochran, J., concurring).