ACCEPTED
06-14-00159-CR
SIXTH COURT OF APPEALS
TEXARKANA, TEXAS
5/13/2015 4:16:14 PM
DEBBIE AUTREY
CLERK

<u>ORAL ARGUMENT REQUESTED ONLY</u>
<u>IF REQUESTED BY APPELLANT</u>

**Nos. 06-14-00159-CR, 06-14-00160-CR**

**IN THE SIXTH COURT OF APPEALS**
**TEXARKANA, TEXAS**

FILED IN
6th COURT OF APPEALS
TEXARKANA, TEXAS
5/13/2015 4:16:14 PM
DEBBIE AUTREY
Clerk

---

**THOMAS LLOYD TAUNTON,**
**Appellant**

**v.**

**THE STATE OF TEXAS,**
**Appellee**

---

**On Appeal in Cause Nos. CR-12-24098, CR-13-24755**
**From the 336TH Judicial District Court**
**of Fannin County, Texas**

---

# STATE'S BRIEF

---

**John B. Setterberg**
**State Bar No. 24043915**
**Assistant Criminal District Attorney**
**Fannin County, Texas**
**101 E. Sam Rayburn Dr., Ste. 301**
**Bonham, Texas 75418**
**903-583-7448**
**903-583-7682 (fax)**

**ATTORNEY FOR THE STATE**

## IDENTITY OF PARTIES AND COUNSEL

The State certifies that the following is a complete list of the parties, attorneys, and other persons with interest in the outcome of this case:

(1) John B. Setterberg, Assistant Criminal District Attorney, Fannin County, Texas, 101 East Sam Rayburn Drive, Suite 301, Bonham, Texas 75418; ATTORNEY FOR THE STATE OF TEXAS.

(2) Steven R. Miears, 211 North Main St., Bonham, Texas 75418; TRIAL AND APPELLATE ATTORNEY FOR APPELLANT.

(3) Thomas L. Taunton, TDCJ # 01946651, Clements Unit, 9601 Spur 591, Amarillo, Texas 79107; APPELLANT.

# **TABLE OF CONTENTS**

IDENTITY OF PARTIES AND COUNSEL ............................................................. i

TABLE OF CONTENTS.................................................................................. ii

INDEX OF AUTHORITIES............................................................................. iii

STATEMENT OF FACTS ...............................................................................1

SUMMARY OF THE ARGUMENT ..................................................................12

ARGUMENT .............................................................................................14

   1. Is it unreasonable to believe that someone who murdered three people just days before might have remnants, weapons, bodies, or other evidence inside his large truck and trailer as he flees across state lines? ...........................14

   2. In any event, the evidence seized from Appellant's truck and trailer did not convict him...................................................................................17

CONCLUSION ..........................................................................................20

PRAYER ..................................................................................................21

CERTIFICATE OF COMPLIANCE..................................................................21

CERTIFICATE OF SERVICE .........................................................................22

# INDEX OF AUTHORITIES

**Cases**

*Bonds v. State*, 403 S.W.3d 867 (Tex. Crim. App. 2013)........................................14

*Clay v. State*, 240 S.W.3d 895 (Tex. Crim. App. 2007) ........................................17

*Crider v. State*, 352 S.W.3d 704 (Tex. Crim. App. 2011) ......................................14

*Davis v. State*, 202 S.W.3d 149 (Tex. Crim. App. 2006) ................................. 15, 16

*Davis v. State*, 203 S.W.3d 845 (Tex. Crim. App. 2006) ........................................17

*Hernandez v. State*, 60 S.W.3d 106 (Tex. Crim. App. 2001) ..................................17

*Illinois v. Gates*, 462 U.S. 213 (1983) ........................................................14

*State v. McLain*, 337 S.W.3d 268 (Tex. Crim. App. 2011) .....................................15

**Rules**

TEX. R. APP. P. 44.2(a)........................................................................17

**Constitutional Provisions**

U.S. CONST. amend. IV ........................................................................14

**Nos. 06-14-00159-CR, 06-14-00160-CR**

**IN THE SIXTH COURT OF APPEALS
TEXARKANA, TEXAS**

————————

**THOMAS LLOYD TAUNTON,**
*Appellant*

**v.**

**THE STATE OF TEXAS,**
*Appellee*

————————

TO THE HONORABLE JUSTICES OF THE SIXTH COURT OF APPEALS:

COMES NOW the State of Texas, by and through her assistant criminal district attorney, and respectfully submits this brief in the above-styled and numbered cause. This is an appeal from two convictions, one for capital murder and one for murder (Cl. R., CR-12-24098, at 14; CR-13-24755, at 15).[1] In the murder case, Appellant was sentenced to life in prison and a $10,000 fine (Cl. R., CR-13-24755, at 150-51). He was sentenced to life without parole on the capital murder conviction (Cl. R., CR-12-24098, at 145-46). The State did not seek the death penalty (Cl. R., CR-12-24098, at 51-52).

## STATEMENT OF FACTS

On the evening of January 15, 2012, Thomas Taunton called the Leonard

---

[1] The cases were tried together and share a single reporter's record. Where necessary, the clerk's records will be distinguished by the corresponding cause number in the trial court.

Police Department and reported that his mother, step-father, and younger sister were missing (Ct. R. vol. 3, at 71). At the time, Appellant resided with his mother, Willie Sue Harpst, her husband, Harold Harpst, and his younger sister, Regina Taunton, at the Harpst residence near Leonard (Ct. R. vol. 3, at 41-42). The officer receiving the call determined that Appellant's residence was outside the city limits, and notified Appellant that he should report his family's disappearance to the Fannin County Sheriff (Ct. R. vol. 3, at 77). Appellant called the sheriff's office, but realized too late that alerting law enforcement might begin a dragnet from which he could not escape, so he terminated the call before filing a complete report (State's Ex. 1; Record Ex. A at 15).[2]

That same day, Appellant's neighbor, Jeff Harpole, saw him loading up his pickup truck, and Appellant left the residence that night towing a trailer (Ct. R. vol. 3, at 45, 54). Appellant left Harpole a voice mail approximately two days later stating that he was traveling, that he had not been able to contact Harold or Willie Sue, and asking Harpole to feed the family's animals while they were gone (Ct. R. vol. 3, at 55-56). When law enforcement arrived at the residence a few days later, Harpole called and spoke briefly with Appellant (Ct. R. vol. 3, at 44). Appellant told him that his family was missing and that he would be traveling for some time (Ct. R. vol. 3, at 44-45). Appellant did not give any indication of where they had

---

[2] Record Ex. A is a transcript of the audio recording in State's Ex. 1 and is located at (Ct. R. vol. 12, at 207-33). Page numbers given are those of the exhibit itself, not of the reporter's record.

gone or when he would be back, and Harpole considered it strange that the family would leave the main gate to the property open and unlocked (Ct. R. vol. 3, at 44, 57, 59).

On the evening of January 17, Appellant called his friend, Kevin Mahon, who lived in West Virginia (Ct. R. vol. 3, at 86, 122). Appellant and Mahon had once collaborated with a country music band, but they hadn't spoken in some time (Ct. R. vol. 3, at 83). He initially left a voicemail informing Mahon that he wanted "to try to make [him] rich" and would give details later (Ct. R. vol. 3, at 87). Approximately 15 to 20 minutes later, Mahon was able to call Appellant back (Ct. R. vol. 3, at 89). After a few minutes of small talk, Appellant informed Mahon that he had killed somebody, and, after a bit of prodding from Mahon, that he had killed his own mother as well (Ct. R. vol. 3, at 89). Mahon was understandably stunned by this news, but he kept his wits about him. Because cell reception was poor in his area, Mahon suggested he call Appellant back when he got home (Ct. R. vol. 3, at 90). Once there, he prepared a digital recorder to capture the conversation, then listened as Appellant calmly described murdering his family (Ct. R. vol. 3, at 90-91).

Appellant's description of the events was harrowing. He described for Mahon how personal differences had arisen between he and Harold (State's Ex. 1; Record Ex. A at 7-8, 12-13, 19-20). He described how Harold, who had lost both

3

legs and was confined to a wheelchair, was having money problems and was not able to keep the residence where he and Willie Sue lived (State's Ex. 1; Record Ex. A at 7-8). They had allowed Appellant and Regina to live there as well, and Harold had asked Appellant to remove his belongings from the barn (State's Ex. 1; Record Ex. A at 7-8). Appellant was angry about this, and he resented Harold for telling him what to do around the house (State's Ex. 1; Record Ex. A at 7-8, 12-13). He also resented the care that Harold required because, in Appellant's words, "I can't be his sitter all day" (State's Ex. 1; Record Ex. A at 13).

So on that Sunday morning, while Harold and Willie Sue were at church, Appellant began "plotting and plotting, trying to strategize what I was going to do" (State's Ex. 1; Record Ex. A at 9-10). He went outside to test-fire two pistols, making sure they were ready when the time came (State's Ex. 1; Record Ex. A at 9-10). Then when Harold and Willie Sue returned,

> I walked into the bathroom where Harold was – Mom was in there – and [she] looked down and saw a gun, so I just popped her first. Dropped her. And then I went after Harold, because he was on the pot. He was having diarrhea problems, and the gun misfired one time, and then I was able to hit him again, but he wasn't dead yet, so I had to pop him again. And Regina walks in, so I had to pop her, my sister.

(State's Ex. 1; Record Ex. A at 10).

Appellant's grisly description of events was corroborated at trial. The examining pathologist testified that Willie Sue was killed by a single gunshot to the back of the head (Ct. R. vol. 6, at 21). The entrance point of the bullet

4

appeared to be a "loose-contact wound," meaning that the searing and burning of the flesh near the wound indicated the gun was likely extremely close to the skin when it was fired (Ct. R. vol. 6, at 23-24). The bullet traveled in an upward trajectory and came to rest in her brain near the top of her skull (Ct. R. vol. 6, at 25, 27).

Harold died as a result of several gunshot wounds (Ct. R. vol. 6, at 114-15). One shot appeared to have grazed his skull, another pierced the base of his neck, and a third was a loose-contact wound to the right side of his skull (Ct. R. vol. 6, at 111-12, 109, 105). Both Harold and Willie Sue were killed with .22 long-rifle caliber bullets that appeared to be fired from the same type of weapon (State's Ex. 67-1).[3]

Appellant's sister was also killed by several gunshot wounds (Ct. R. vol. 6, at 32, 43). Unlike her parents, however, Regina was shot by two different weapons.[4] One round was recovered from the left side of her brain and appeared to be of the same caliber and rifling that killed Appellant's parents (Ct. R. vol. 5, at 16; Ct. R. vol. 6, at 79). It created a loose-contact wound on the right side of the face, near Regina's cheekbone (Ct. R. vol. 6, at 37-38). Two additional rounds

---

[3] The rifling, or grooves on the inside of the barrel of the firearm, left consistent marks on the bullets retrieved from both Willie Sue and Harold Harpst (State's Ex. 67-1).

[4] Texas Ranger, Brad Oliver, testified that State's exhibits 30, 31 and 33 were bullets that were removed from Regina's body at autopsy (Ct. R. vol. 5, at 16-18). James Jeffress, a forensic scientist at the DPS laboratory in Garland, Texas, testified that State's exhibit 30 came from one type of weapon, while exhibits 31 and 33 necessarily came from another (Ct. R. vol. 6, at 79-80).

5

were recovered that were of a different caliber and were fired from a different weapon (Ct. R. vol. 5, at 16-18; Ct. R. vol. 6, at 80). One was located in a wound to Regina's left abdomen and the other was recovered from the right side of her brain after causing a loose-contact wound to her left temple (Ct. R. vol. 6, at 42-43, 40). Additionally, Regina had a fourth wound, also a loose-contact wound, that appeared to enter the right side of her scalp, graze the top of her skull, and partially exit less than half an inch away (Ct. R. vol. 6, at 33-34; State's Ex. 61). The medical examiner was able to collect fragments of metal from the surrounding tissue, but not a complete bullet (Ct. R. vol. 6, at 36-37).

Appellant went on to describe his efforts to conceal the murders. He told Mahon that he hid Harold's vehicle somewhere and that cleaned the house in an attempt to remove any biological evidence (State's Ex. 1; Record Ex. A at 2). Of course he recognized the futility of the gesture, as he'd seen "too many freakin' crime-scene shows" to know that "they can find the blood splatters or whatever," and that he would not be able to "clean that stuff up with just bleach" (State's Ex. 1; Record Ex. A at 2).

Indeed, the DPS task force that canvassed the residence found that the carpet in the master bathroom had been roughly cut and torn out, and that certain areas had been hastily cleaned (Ct. R. vol. 4, at 89). Nevertheless, the team was able to collect blood evidence from each victim at various points throughout the house.

6

Officers located samples of blood from Willie Sue and Harold at various places throughout the master bathroom, as well as on the carpet of the room just outside of the master bedroom (State's Ex. 75, 76). They located samples of blood from Regina at two places in the living room of the residence, as well as on the stoop of the back porch (State's Ex. 75, 76). Officers also located several more samples from the living room, dining room, den, master bedroom and master bathroom that presumptively tested positive but were not subject to laboratory testing (State's Ex. 75, 76). Additionally, officers located a spent round lodged into the wall of the master bathroom, just to the left of the toilet (Ct. R. vol. 4, at 94). This location would have been consistent with Appellant's claim to have shot Harold while the latter was sitting "on the pot." Forensic analysis also showed the bullet was of the same caliber and was fired from the same type of weapon as the bullets that killed Harold Harpst (Ct. R. vol. 6, at 79). Officers later discovered Harold Harpst's vehicle abandoned in the parking lot of a Best Western Inn in Durant, Oklahoma (Ct. R. vol. 3, at 238).

Appellant's confession continued with his detailed description of the terrain on which he deposited the bodies, and the manner in which he left them. According to Appellant, it took him two days to find a suitable location (State's Ex. 1; Record Ex. A at 15). At first he sought to find a place in Oklahoma, but later:

> I went back down through Highway 11 and found a place with an old barn on the side of the road that had a big piece of property. The barn was big enough that I could hide behind it 'till dark, and I needed the truck out because it was probably about 800 yard – I mean, 800 feet from the barn to the edge of the property was, the creek, and a wooded area where I could put the bodies.

(State's Ex. 1; Record Ex. A at 15-16). Officers eventually located the bodies on property just west of Highway 11 and south of FM 1417 in Grayson County, Texas (Ct. R. vol. 4, at 167). The property contained a large barn and other structures, as well as a creek and wooded area that ran at approximately the same distance Appellant described from the road (Ct. R. vol. 4, at 169; State's Ex. 9). There were fresh tire tracks in the grass that appeared to be made by a large vehicle, and a second set that appeared to have been made by a pulled trailer (Ct. R. vol. 4, at 176-77). Additionally, the State called four witnesses who each testified to seeing a white truck and white enclosed trailer on the property on or around Martin Luther King Day in January, 2012.[5] They testified that they had never seen the truck or trailer there before or since, and that they considered it out of the ordinary at the time (Ct. R. vol. 5, at 143, 150-51, 156, 162).

The bodies were located as the Appellant described them, and they appeared to be arranged in roughly a line from the road to the creek, as if they had been dumped in sequence (Ct. R. vol. 4, at 174). Harold was found closest to the road,

---

[5] (Ct. R. vol. 5, at 143-44, 149-50, 155-56, 161).

though still several hundred feet from the highway (Ct. R. vol. 4, at 179). He was dressed only in a shirt, and was naked from the waist down, consistent with Appellant's statement that he had been using the bathroom when he was killed (Ct. R. vol. 4, at 179). Harold had apparently been transported in a large oil drum, and was found lying just outside of its opening in the field (Ct. R. vol. 4, at 179). Several feet further in, closer to the tree line, was Willie Sue's body (Ct. R. vol. 4, at 181; State's Ex. 9). She was found inside of a similar oil drum, and had apparently been put inside head first (Ct. R. vol. 4, at 181-83; State's Ex. 9). She was dressed in slacks and a sweater, with socks or stockings but no shoes (Ct. R. vol. 4, at 183). Nearby was Regina's body (Ct. R. vol. 4, at 183; State's Ex. 9). She was lying out in the elements and did not appear to have been transported in a barrel (Ct. R. vol. 4, at 182, 183; State's Ex. 9). She was dressed in only a nightgown, consistent with Appellant's statement that she had stayed home that morning and not attended church (Ct. R. vol. 4, at 182; State's Ex. 9). Officers also discovered a pair of heavy rubber gloves in the field near the location of the bodies (Ct. R. vol. 4, at 195-96). The gloves had Harold's blood on them, as well as Appellant's DNA (State's Ex. 75, 76). Lab analysis also confirmed that DNA from Regina, Willie Sue, and the Appellant was on the boots that Appellant was wearing when he was later arrested (Ct. R. vol. 5, at 88-89; State's Ex. 75,76).

The final topic of relevant information in Appellant's call to Kenneth Mahon

9

involved his actions during the days following the murders. During the time that Appellant was seeking a place to dispose of the bodies, Appellant withdrew substantial sums of money from Harold and Willie Sue's bank accounts, used her credit cards to buy gas, and drove back and forth between Leonard and Oklahoma several times (State's Ex. 1; Record Ex. A at 9). At trial, the State presented evidence corroborating the withdrawals, as well as evidence of the several stops Appellant made to put gas in his truck (State's Ex. 2-7, 12). It also presented evidence that the Appellant used his parents' account information at the Choctaw Casino in Oklahoma (State's Ex. 37-39). The State produced video of the Appellant at the casino and at gas stations in Bonham, Sherman, and Denison, Texas (State's Ex. 5-7, 12, 39).

When he hung up the phone with Appellant, Mahon was immediately concerned for his own safety and for that of his family (Ct. R. vol. 3, at 93). He contacted a friend of his in the West Virginia State Police, J.L. Burdette (Ct. R. vol. 3, at 93). The next morning he met with Trooper Burdette and delivered the recording (Ct. R. vol. 3, at 94). Trooper Burdette, in turn, contacted the Leonard Police Department, who referred him to the Fannin County Sheriff's Office (Ct. R. vol. 3, at 124-25).

Shortly thereafter, Texas Ranger Brad Oliver began his investigation (Ct. R. vol. 3, at 195). Fannin County sheriff's deputies had already searched the Harpst

10

residence as part of a welfare check (Ct. R. vol. 3, at 171). They did not locate any people or dead bodies, but did discover suspicious circumstances and what appeared to be blood outside (Ct. R. vol. 3, at 170-72). Oliver obtained a search warrant for the residence and an arrest warrant for Appellant (Ct. R. vol. 3, at 201). He also sought and obtained permission to track Appellant's cell phone by "pinging" its location off of nearby cell towers (Ct. R. vol. 3, at 205-07). From this, law enforcement determined that Appellant was headed east toward Louisiana, consistent with his statement to Kenneth Mahon that he was traveling to Mississippi (Ct. R. vol. 3, at 206). Ranger Oliver then contacted the U.S. Marshall's Office in Louisiana to advise them of the warrant and Appellant's suspected whereabouts (Ct. R. vol. 3, at 207).

The Marshalls, in turn, notified local law enforcement to be on the lookout for Appellant (Ct. R. vol. 5, at 61). He was apprehended at a Ford dealership in DeSoto Parish, Louisiana that same day (Ct. R. vol. 5, at 62). Appellant's truck and trailer were also located at the dealership, and dealership personnel later testified that Appellant had told them he was headed from Texas to Mississippi after having a fight with his step-father (Ct. R. vol. 5, at 57, 137). Based on the information gathered to that point of the investigation, officers obtained a search warrant for Appellant's truck and trailer from District Judge Charles Adams (Ct. R. vol. 5, at 65; Record Ex. 2). They executed that warrant the next morning in a

11

secured law enforcement facility in DeSoto Parrish (Ct. R. vol. 5, at 65-66).

Although Appellant's truck and trailer were packed with belongings, officers found very little of evidentiary value. The only evidence during the search that was later used at trial included receipts for Appellant's gasoline purchases,[6] Willie Sue's social security card and several credit or debit cards belonging to Harold and Willie Sue,[7] two firearms that were determined to not be the murder weapons,[8] several unspent rounds of ammunition, some of which matched the ammunition Appellant used to kill his victims,[9] two packages of hair and beard dye purchased a few days after the murders,[10] the key to Harold's vehicle,[11] and two swabs of blood on the inside of the trailer.[12] Lab testing confirmed the blood belonged to Willie Sue Harpst and Regina Taunton (State's Ex. 75, 76).

## SUMMARY OF THE ARGUMENT

Appellant complains in a single point of error that evidence obtained under a pair of faulty search warrants was admitted against him in his trial. Specifically, he claims that the affidavits upon which the warrants to search his truck and trailer

---

[6] State's Ex. 50.
[7] State's Ex. 49, 51.
[8] State's Ex. 45, 46.
[9] State's Ex. 47, 48, 52, 54-56. The ammunition matched that used in the murders only in caliber and possibly manufacturer. There was no forensic evidence specifically linking the ammunition to the murders, and the testimony at trial was that it was of a very common and widely distributed variety (Ct. R. vol. 6, at 87).
[10] State's Ex. 41.
[11] State's Ex. 53.
[12] State's Ex. 44.

were based did not recite probable cause and therefore did not support the warrants' issuance. He asks this Court to essentially conduct a *de novo* review of the issuing magistrate and re-determine his finding of probable cause. However, the law requires this Court to defer to an issuing magistrate and uphold his findings when there are any facts or inferences that provide a substantial basis for believing evidence will be found in a certain place. In this case, the facts presented to the magistrate, coupled with the inferences he could have reasonably drawn from those facts, were sufficient to believe that evidence of the murders for which Appellant was arrested would be in the vehicles where he was found. Appellant's point of error should therefore be overruled and his conviction affirmed.

Moreover, even if the issuing magistrate erred in signing the warrants, most of the evidence recovered was not admitted at Appellant's trial. The small portion that was admitted was merely cumulative of or corroborated by other evidence and, when judged in the grand scheme of the evidence against him, was largely inconsequential to Appellant's conviction. As such, any error should be considered harmless beyond a reasonable doubt and Appellant's conviction should be affirmed.

13

## ARGUMENT

1. **Is it unreasonable to believe that someone who murdered three people just days before might have remnants, weapons, bodies, or other evidence inside his large truck and trailer as he flees across state lines?**

The Fourth Amendment to the U.S. Constitution requires that search warrants be based on sworn affidavits reciting probable cause, and specifically describing the place to be searched and the things to be seized. U.S. CONST. amend. IV. Probable cause exists when, under the totality of the circumstances, there is a fair probability or substantial chance that evidence of the crime will be found at a specified location. *Bonds v. State*, 403 S.W.3d 867, 873 (Tex. Crim. App. 2013). The affidavit supporting the warrant must contain sufficient facts to convince a magistrate that the items sought are probably in the place to be searched. *Crider v. State*, 352 S.W.3d 704, 707 (Tex. Crim. App. 2011). On appeal, a magistrate's finding of probable cause is to be given great deference,[13] and after-the-fact scrutiny of the sufficiency of an affidavit should not take the form of a *de novo* review. *Illinois v. Gates*, 462 U.S. 213, 236 (1983). The duty of a reviewing court is simply to ensure that the magistrate had a "substantial basis" for concluding that probable cause existed. *Crider*, 352 S.W.3d at 712. When in doubt, an appellate court should defer to all reasonable inferences that the magistrate could have made. *Bonds*, 403 S.W.3d at 873.

---

[13] *Crider*, 352 S.W.3d at 712.

While the facts alleged must be specific, affidavits are not to be read hypertechincally. *Davis v. State*, 202 S.W.3d 149, 154 (Tex. Crim. App. 2006). Rather, they should be considered in a practical, common-sense, and realistic manner, bearing in mind that the magistrate may also determine probable cause from any reasonable inferences he draws. *Id.* At heart, the reviewing court should focus on the reasonableness of the magistrate's conclusions, not on what the affiant conveyed as the author of the affidavit. *State v. McLain*, 337 S.W.3d 268, 274 (Tex. Crim. App. 2011).

With this focus in mind, it can reasonably be said that Judge Adams had a substantial basis for believing there would be some evidence of the recent murders in Appellant's truck. He knew that the murders were committed just days before, and that a sitting Texas judge had already found probable cause to believe Appellant had committed them. He knew that just one day prior, officers suspected Appellant of driving a large, white pickup truck and pulling a large covered trailer, and that on the same day Appellant had been found with both truck and trailer at a Louisiana dealership. From this, he could reasonably infer that officers had received reliable information pertaining to Appellant's vehicle and trailer from a person with knowledge sometime in the days after the murders. Moreover, he could infer from the timing of Appellant's trip that he was actively fleeing his home state of Texas on his way to Mississippi. Moreover, the judge

15

must have known that, ubiquitous as a pickup truck might have been in the area, the addition of a large, covered, locked trailer was not necessarily a common accessory. Such an accessory would only be useful if Appellant were hauling a large cargo – for instance bodies, carpet, guns, ammunition, and instruments of "bleeding injuries or other violent trauma" – and a covered trailer would be ideal if Appellant wanted to hide his cargo, or any attendant blood spatter, droplets, smears, or pools, from the outside. In short, Judge Adams could have reasonably concluded, from the facts that he had and the inferences therefrom, that there was a substantial basis to believe some evidence existed within Appellant's truck or trailer that connected him to the Texas murders. Appellant's point of error should therefore be overruled.

This is not to say that the affidavits in this case were in any way perfect. Given the facts known to law enforcement at the time, a much more "fleshed out" version should have been presented to Judge Adams and, that accomplished, this appellate discussion might have been avoided altogether. On the facts given, Judge Adams might have declined to issue the warrant, but he did not. The law requires deference to the magistrate's reasonable, common sense conclusions, and appellate courts must allow for any reasonably available inferences in according such deference. *See Davis v. State*, 202 S.W.3d 149, 157-58 (Tex. Crim. App. 2006). As such, Appellant's point of error should be overruled.

## 2. In any event, the evidence seized from Appellant's truck and trailer did not convict him.

Even assuming error, Appellant's convictions should nevertheless be upheld given the wealth of other evidence supporting his guilt and the relative paucity that was derived from the truck and trailer searches. Erroneous admission of evidence over a Fourth Amendment objection is considered constitutional error. *Hernandez v. State*, 60 S.W.3d 106, 106 (Tex. Crim. App. 2001). In such a case, reversal is required unless the appellate court determines beyond a reasonable doubt that the error did not contribute to the conviction. *Id.* at n.1; TEX. R. APP. P. 44.2(a). That is, unless there is a reasonable possibility that the error, within the context of the entire trial, moved the jury from acquitting the defendant to convicting him, then there is no harm. *Davis v. State*, 203 S.W.3d 845, 852-53 (Tex. Crim. App. 2006).

This determination requires an appellate court to consider the entire record. *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007). Among the factors that must be weighed are (1) the importance of the complained-of evidence to the State's case, (2) whether the evidence was cumulative of other evidence at trial, (3) the presence or absence of other evidence corroborating or contradicting the complained-of evidence, and (4) the overall strength of the State's case. *Id.* The reviewing court may also consider any other factor contained in the record that affects the probable impact of the error. *Id.*

Starting with the fourth factor, the State presented an overwhelmingly strong

17

case against the defendant. Chief among the State's evidence was the Appellant's recorded confession to his friend, Kenneth Mahon. The jury listened as the Appellant described, in his own voice and words, how he planned and executed the systematic murders of his own family. That alone would likely have been sufficient to convict the Appellant, but the State spent the better part of the next week corroborating Appellant's statements with information from various sources. The jury heard testimony from the neighbor who saw Appellant packing his vehicle and received the odd phone call asking him to feed the animals, they heard from the Leonard police officer who fielded Appellant's initial report that his family was missing. They heard from Ranger Oliver, as well as two other Rangers assigned to processing the crime scene at the house and the field where the bodies were found. They heard that the blood evidence throughout the residence was consistent with Appellant's version of events to Mahon, and they heard how the grisly dump site was also eerily similar to Appellant's description. They heard the DNA evidence linking Appellant to gloves found at the dump site, and identifying Regina's and Willie Sue's blood on the boots Appellant was eventually arrested in. They heard evidence that the entry wounds and final placement of the bullets was consistent with not only the timeline Appellant described for the murders, but also of the likely position of his mother and the struggle he had with Harold. They saw evidence of Appellant's stealing his parents' money after their murder, and of him

18

using their credit cards to purchase gas in Bonham, Denison, and Sherman over the next few days while he searched for a place to dispose of their bodies. They learned how he was apprehended in Louisiana, presumably on his way to Mississippi, and how he told employees of the dealership that he'd left his home in Texas because of an argument with his step-father. In short, even setting aside what was found in his vehicle, the jury received a massive amount of evidence corroborating Appellant's own description of how he'd carried out the pre-meditated murder of his family, and how he tried to cover it up.

While it is true that some portion of the property located in the truck and trailer was introduced into evidence, it was but a small fraction of the State's overall presentation. The items were largely cumulative of and corroborated by other evidence at trial, and none of the items had any direct bearing on the commission of the murders. Moreover, with the exception of a tangential mention of the hair dye and gas receipts, none of the items were at all emphasized by the State. Thus, viewing the evidence as a whole, the property recovered during the search of Appellant's truck and trailer was, for all intents and purposes, inconsequential to his ultimate conviction. It cannot be said to have tipped the scales or moved the needle, or to otherwise have swayed the jury to convict Appellant when it otherwise would have acquitted him. As such, any error in the admission of said evidence was harmless beyond a reasonable doubt, and

19

Appellant's point of error should be overruled.

## CONCLUSION

Judge Adams properly issued a search warrant for Appellant's truck and trailer based on the facts presented to him and the reasonable inferences he was able to draw from the supporting affidavit. Given the highly deferential standard in reviewing the actions of an issuing magistrate, this Court should conclude that Judge Adams had a substantial basis for issuing the warrants and overrule Appellant's point of error. Even if this Court concludes that Judge Adams should not have issued the warrants, it should still nonetheless consider the error harmless, as the property recovered in the search was dwarfed by the other evidence presented at trial and was virtually inconsequential to Appellant's conviction.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, there being no reversible error in the trial of this case, the State respectfully moves this Court to overrule Appellant's point of error and affirm his conviction. The State further prays for any and all such additional relief as the Court may deem just and appropriate.

Dated: <u>May 13, 2015</u>

Respectfully submitted,


/s/    *John B. Setterberg*
John B. Setterberg
State Bar No. 24043915
Assistant Criminal District Attorney
Fannin County, Texas
101 East Sam Rayburn Dr., Suite 301
Bonham, Texas 75418
903-583-7448
903-583-7682 (fax)

## **CERTIFICATE OF COMPLIANCE**

The undersigned hereby certifies that the foregoing document contains 5,068 words, exclusive of the portions described by TEX. R. APP. P. 9.4 (i)(1), as computed by the computer program used to prepare the document.

/s/    *John B. Setterberg*
John B. Setterberg
Assistant Criminal District Attorney
Fannin County, Texas

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was served electronically to the individual listed below on this the 13th day of May, 2015.

/s/     *John B. Setterberg*
John B. Setterberg
Assistant Criminal District Attorney
Fannin County, Texas

Steven R. Miears
211 North Main St.
Bonham, Texas 75418
ATTORNEY FOR APPELLANT