

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-15-00107-CR

JOHN ST. ANGELO                                                    APPELLANT

V.

THE STATE OF TEXAS                                                      STATE

----------

### FROM THE 396TH DISTRICT COURT OF TARRANT COUNTY
### TRIAL COURT NO. 1354157D

----------

## MEMORANDUM OPINION[1]

----------

Appellant John St. Angelo appeals from his murder conviction and life sentence. Because we conclude that the admission of Appellant's custodial statements to a paramedic, even if erroneous, did not contribute to Appellant's conviction or punishment; that Appellant failed to preserve his issue regarding

---

[1]*See* Tex. R. App. P. 47.4.

the time allotted to voir dire the jury venire; and that a series of emails between Appellant and the victim was admissible, we affirm the trial court's judgment.

## I.  BACKGROUND

### A.  FACTUAL

Appellant and the victim, Suzanne Parsons, were married, but Parsons initiated divorce proceedings in 2013.  Appellant worked as a handyman for a real-estate agency, where Parsons was a realtor.  Appellant and Parsons were having financial difficulties, and Parsons suspected that Appellant was mentally ill.[2]  What seemed to have been the tipping point for Parsons, however, was Appellant physically beating and attempting to strangle her while they were on a trip to Mexico in May 2013.  Parsons returned home early from the trip with a black eye, swollen face, cut ear, bruised cheek, and bruises around her neck.  At some point, Parsons sought a protective order against Appellant.

Appellant wanted to reconcile with Parsons, texting or calling her numerous times each day.  On December 28, 2013, Appellant emailed Parsons, complaining that she would not respond to his calls or texts.  Parsons responded that she could not talk to him and that if he had a work question, he should contact her daughter, Jessica, who also worked at the real-estate agency.  This precipitated a lengthy response from Appellant on December 29, 2013, in which he used profanity, called her a "gold digging fat, fat ass whore," warned that she

---

[2]Parsons previously had arranged the employment for Appellant at her real-estate office to ease their financial problems.

2

was "going to pay," and stated he "wish[ed]" she "would expire." Parsons replied, "These are clearly threats and will be reported." Parsons forwarded the entire exchange to Dee Arnold, the real-estate agency's administrator.

On Monday, December 30, 2013, Parsons was noticeably nervous at work, frequently "peeking" through the window blinds because she suspected that Appellant had been following her. Around 4:00 p.m., Appellant arrived and went to Parsons's office. About twenty minutes later, the receptionist, Cookie Clardy, and another realtor, Keely Harris, heard Parsons scream, "Get him off of me." By the time Clardy and Harris got back to Parsons's office and unlocked the door, Appellant was bent over Parsons and was repeatedly stabbing her with a knife. Parsons was covered in blood and making a "gurgling" sound. Clardy and Harris ran away and called police. Another realtor, Dawn Karr, reached the office after Clardy and Harris fled and heard Appellant say, "[W]ell, now, that's done." Karr also ran for her life. Clardy saw Appellant running from the building, and she, Harris, and Karr went to check on Parsons. By that point, Parsons was dead.

The next day, police located Appellant at a house where he had barricaded himself.[3] When the police tried to enter the house, they "were receiving [rifle] shots from the inside of the house to the outside of the house." While he was in the house, he talked on the phone to his daughter and told her that he had stabbed Parsons multiple times, said Parsons "got what she deserved," and

---

[3]Apparently, "a female that was a resident of that home" called police to report that Appellant was there and gave her consent for police to enter.

"described the gurgling sounds that she made when she passed away." Officers then heard a single rifle shot from inside the house. The police "deploy[ed] gas" into the house, resulting in a "total gas-out,"[4] and sent in a robot to locate the shooter and determine if he was still alive. Appellant eventually came out of the house but refused to raise his hands, forcing the officers to subdue him with a Taser and handcuff him.

Appellant had shot himself below the chin. A paramedic at the scene, Jeff Popp, asked Appellant several questions while treating him. Once it was decided that Appellant should be taken to a hospital, another paramedic, James Evans, put Appellant in an ambulance and rode with him to the hospital. Officer Brandy Salazar also accompanied Appellant in the ambulance with Evans. Evans asked Appellant several questions during the ride to the hospital, and Salazar wrote down his responses. Appellant "said something about Mexico" and admitted to shooting himself, to shooting at the police, and to fighting with Parsons because he was "sick of her mouth."

## B. PROCEDURAL

A grand jury indicted Appellant with murder and alleged that he used a deadly weapon—a knife—during the offense. *See* Tex. Penal Code Ann. § 1.07(a)(17)(B) (West Supp. 2015), § 19.02 (West 2011). Before trial, Appellant filed a motion seeking to suppress the oral statements he made to the

---

[4]A police officer explained that this meant they were "try[ing] to fill that entire house up with gas as quickly as possible."

4

paramedics while he was in custody and requesting a hearing on their admissibility. *See* Tex. Code Crim. Proc. Ann. art. 38.22, § 6 (West Supp. 2015).

The trial court held a hearing and heard testimony from the paramedics and Salazar. The evidence at the hearing revealed that Evans checked Appellant's airway, determined that Appellant's vital signs were stable, and did not administer any pain medication to Appellant. Evans then asked Appellant several questions in the ambulance, most of which Appellant answered, Salazar heard, and Salazar wrote down as follows:

Evans asked St. Angelo, "Did you try to kill yourself yesterday?"
St. Angelo: "No"

Evans: "When did you shoot yourself?"
St. Angelo "There was nothing in the barrel. No bullet. Compressed Air."

Evans: "What year is it?"
St. Angelo: "2013"

Evans: "What happened today? Did the police shoot you?"
St. Angelo: no answer

Evans: "Were you shooting at officers?"
St. Angelo: "Yes. I wanted them to leave me alone, let the negotiators negotiate."

Evans: "What happened yesterday? Did you do something bad?"
St. Angelo: "yes"

Evans: "Did you hurt her?"
St. Angelo: "Yes, [w]e were fighting. I was sick of her mouth."

Evans: "Did you know you were gonna do that?"
St. Angelo: mumbling, [un]intelligible, something about Mexico then "She kept running her mouth."

5

St. Angelo: "My mouth hurts.  I shot myself with a .22 rifle."
Evans: "When?"
St. Angelo: "After Joey left.  He's an officer.  He came for lunch."

Evans: "When did you shoot yourself?"
St. Angelo: "They got me"

Evans: "Where is your wife now?"
St. Angelo: "They took her away in an ambulance.  I don't know."

The trial court denied the motion to suppress, ruling that Appellant's custodial statements were admissible, and orally entered findings and conclusions on the record:

> The Court will find that any statement made to paramedics or . . . Salazar [was] done while the defendant was in custody.  However, the Court will also find that the paramedics Evans and Popp are not peace officers as designated by Article 2.12, Code of Criminal Procedure.
>
> And there is no evidence of an agency relationship existing between the police department and the paramedics.  The evidence . . . is quite contrary to that in that they were - - both officers testified that neither of the officers directed any questioning by either Mr. Evans or Mr. Popp.
>
> So the Court will deny the motion to suppress as to Evans and Popp on the agency relationship and the fact that they are not peace officers under Article 2.12 of the Code of Criminal Procedure.  And, therefore, 38.22 of the Code of Criminal Procedure does not apply to Evans and Popp.
>
> In regard to the statements heard by . . . Salazar, the Court will find that 38.22 does not apply in that even though the defendant was in custody, they were not elicited as the result of custodial interrogation by [Salazar].  And the Court will deny the motion to suppress as to . . . Salazar.

See State v. Cullen, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006) (stating "findings and conclusions [regarding a motion to suppress] need to be recorded

6

in some way, whether written out and filed by the trial court, or stated on the record at the hearing").

At trial, Appellant testified that he stabbed Parsons in self-defense after she threatened him with a knife. *See* Tex. Penal Code Ann. §§ 9.31–.32 (West 2011). The trial court charged the jury and submitted the issue of self-defense through the use of deadly force.[5] The jury found Appellant guilty of murder as charged in the indictment, including the deadly-weapon allegation. At the punishment phase of trial, the trial court charged the jury on the issue of sudden passion based on Appellant's prior testimony. *See id.* § 19.02(d). The jury rejected Appellant's sudden-passion issue and assessed his punishment at life confinement and a $10,000 fine. The trial court entered judgment in accordance with the jury's verdicts.

On appeal, Appellant argues that the trial court erred by denying his motion and admitting the oral statements he made to Evans[6] because the admission violated his Fifth Amendment rights and article 38.22. Appellant also

---

[5]The trial court did not include the instruction dictated by article 38.22, section 6. But Appellant did not object to the omission of such an instruction and does not argue charge error on appeal. *See generally Oursbourn v. State*, 259 S.W.3d 159, 174–76 (Tex. Crim. App. 2008) (holding if defendant fails to request article 38.22 instruction, its absence may be reviewed only for egregious harm as unobjected-to charge error).

[6]Appellant does not assert in his brief that the statements he made to Popp while he was in custody were inadmissible or violated his Fifth Amendment rights.

challenges the admission of the emails Parsons forwarded to Arnold and the trial court's time limitation on voir dire.

## II. ADMISSION OF CUSTODIAL STATEMENTS

In his first point, Appellant argues that the trial court abused its discretion by denying his motion to suppress and admitting the custodial statements he made to Evans because Evans was acting as an agent of law enforcement. Whether Evans was an agent of law enforcement is determined on the basis of the entire record and requires an examination of the relationship between the police and the potential agent and the actions and perceptions of the police, the potential agent, and the defendant. *Berry v. State*, 233 S.W.3d 847, 855 (Tex. Crim. App. 2007); *Hailey v. State*, 413 S.W.3d 457, 480 (Tex. App.—Fort Worth 2012, pet. ref'd). "The essential inquiry is: 'Was this custodial interview conducted (explicitly or implicitly) on behalf of the police for the primary purpose of gathering evidence or statements to be used in a later criminal proceeding against the interviewee?'" *Berry*, 233 S.W.3d at 855 (quoting *Wilkerson v. State*, 173 S.W.3d 521, 531 (Tex. Crim. App. 2005)).

In this case, however, we need not answer this question. Even if Evans were acting as an agent of law enforcement when he questioned Appellant in the ambulance such that the admission of Appellant's statements violated the Fifth Amendment, we conclude beyond a reasonable doubt that the error did not contribute to Appellant's conviction or punishment. *See* Tex. R. App. P. 44.2(a). In determining such harm, we consider several factors: the importance of the

8

evidence to the State's case, whether the evidence was cumulative of other evidence corroborating or contradicting the evidence on material points, the overall strength of the State's case, and any other factor revealed by the record that may shed light on the probable impact of the error on the mind of the average juror. *See Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007). A constitutional error does not contribute to a conviction if the jury's verdict would have been the same even if the erroneous evidence had not been admitted. *See id.* We are to ask "if there was a reasonable possibility that the error, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion as to the issue in question." *Westbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000).

After Clardy and Harris heard Parsons screaming for help, they saw Appellant, bent over a prostrate and unmoving Parsons, repeatedly stabbing her. After Clardy and Harris fled, Karr heard Appellant say, "Well, now, that's done," before he fled the office. The next day while he was barricaded in a home surrounded by police officers, Appellant answered a call from his daughter. Appellant admitted that he stabbed Parsons fifteen to twenty times,[7] said that "the [f_____] bitch got what she deserved," and described Parsons's "gurgling" as she lay dying. His daughter described his mood at the time as "satisfied . . . [w]ith himself and with his actions."

---

[7]The autopsy revealed that Parsons sustained twenty-four cuts or stab wounds during the attack.

Appellant's statements in the ambulance that he had done something "bad," that he was "sick of [Parsons's] mouth," and that Parsons "kept running her mouth," were cumulative of other admitted evidence or were not important to the State's strong evidentiary case against Appellant on the indicted offense. In sum, the admission of Appellant's statements in the ambulance, even if erroneous, would not have moved the jury from unpersuaded to persuaded regarding Appellant's culpability; thus, any error did not contribute to Appellant's conviction or punishment. *See* Tex. R. App. P. 44.2(a); *see, e.g.*, *Garcia v. State*, No. 04-08-00677-CR, 2010 WL 816202, at *4–6 (Tex. App.—San Antonio Mar. 10, 2010, no pet.) (mem. op., not designated for publication). We overrule Appellant's first point.

### III. VOIR DIRE LIMITATION

In his second point, Appellant argues that the trial court abused its discretion by denying counsel's request for additional time to question the venire. The State asserts that Appellant did not preserve error on this issue for our review. To preserve error on a claim that the trial court abused its discretion by limiting voir dire, the record must reflect a proper and specific question that the trial court did not allow the venire to answer. *See Sells v. State*, 121 S.W.3d 748, 756 (Tex. Crim. App.), *cert. denied*, 540 U.S. 986 (2003); *Saldinger v. State*, 474 S.W.3d 1, 5 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd).

Here, the trial court allowed Appellant ninety minutes to conduct his voir dire examination of the venire. At the end of counsel's time, the trial court told

10

her to "wind it down." Counsel asked for more time because "[i]t's a very large case." The trial court responded, "I know it's a very large case. I know exactly that it's a very large case, and I know that the State did it in less than an hour and a half. . . . And you spent a lot of time on stuff, and you could have moved on." Counsel pressed for a "brief[]" amount of time to address "constitutional issues," which the trial court allowed.

Counsel resumed and questioned the venire for an additional three pages. After counsel asked a question to the entire venire about their understanding of deadly force, the trial court had counsel approach the bench, where an off-the-record discussion occurred. When the discussion was over, Appellant's counsel thanked the jury for their time. After the venire was excused for counsel to make their peremptory and for-cause challenges, counsel attempted to explain on the record her issue with the time limitation:

> I understand the time was allotted was one hour and a half. I still had some points to go over, would like to put on the record the things that I wished to have continued to briefly discuss just to briefly make sure as quickly as possible that I wanted to discuss deadly force and protection of life, the Defendant testifying, and go over the burdens of proof one more time for them to have a better understanding.
>
> Since I did not get to discuss the burdens of proof that would be allotted in the sudden passion element, I told them I would go back and explain it. I didn't have a chance to do it. I apologize to the Court I ran over a couple minutes, but it was very important for my client to get fair jurors. This is a tough crowd. They are all educated and married for a long time, and I had to use some of that time to be able to get their minds to be open that not everyone has the same happily forever life.

So I spent a little extra time on that to try to illustrate that point, and it took away my right to get to some constitutional issues and a couple of statutes that I felt was important for them to understand from the Defense's perspective.

Indeed, counsel had spent a large amount of her time asking the venire questions about divorce and bad relationships.

First, at no time did counsel object to the trial court's action in ending voir dire and, of course, she did not get an adverse ruling from the trial court on the record. *See* Tex. R. App. P. 33.1(a). Second, counsel did not make a bill of exception or otherwise state on the record the specific questions she would have asked had she been given more time.[8] *See* Tex. R. App. P. 33.2; *Saldinger*, 474 S.W.3d at 6; *cf. Wappler v. State*, 183 S.W.3d 765, 773–74 (Tex. App.— Houston [1st Dist.] 2005, pet. ref'd) (op. on reh'g). Counsel's statement of the general legal areas she wanted to cover was insufficient. *See Saldinger*, 474 S.W.3d at 6. We conclude Appellant failed to preserve any error arising from the limitation of voir dire and overrule point two.

## IV. ADMISSIBILITY OF EMAILS

In his final point, Appellant argues that the trial court abused its discretion by admitting over objection the string of emails between Appellant and Parsons that Parsons forwarded to Arnold. He asserts that the emails were insufficiently authenticated through Arnold's testimony.

---

[8]We note that counsel asked the venire about many of the general topics she identified.

At trial, Arnold testified that she received the forwarded string of emails at her email address from Parsons's email address on December 30, 2013, approximately four hours before Appellant appeared at the real-estate office and stabbed Parsons. Arnold testified that Parsons represented that Appellant had sent the emails to Parsons. Arnold reviewed the exhibit containing the emails and confirmed that the exhibit was a fair and accurate depiction of what she received from Parsons that day. Counsel objected to the admission of the email string because "[i]t was claimed by [Arnold] to be a forwarded email entered by someone" and, therefore, was "not properly authenticated."

Authenticity of evidence is a preliminary admissibility question for the trial court. *Tienda v. State*, 358 S.W.3d 633, 637–38 (Tex. Crim. App. 2012); *see* Tex. R. Evid. 104(a). To answer this question, the trial court is to determine whether the proponent supplied facts that would be sufficient to support a reasonable determination by a fact-finder that the proffered evidence is authentic. Tex. R. Evid. 901(a); *Tienda*, 358 S.W.3d at 638. In other words, the ultimate question of authenticity of evidence is a question for the fact-finder. *Tienda*, 358 S.W.3d at 638. "Evidence may be authenticated in a number of ways, including by direct testimony from a witness with personal knowledge, by comparison with other authenticated evidence, or by circumstantial evidence." *Id.* Further, contents and substance, "taken together with all the circumstances," also provide authenticity. Tex. R. Evid. 901(b)(4). We review the trial court's

conclusion regarding preliminary admissibility based on authenticity under an abuse-of-discretion standard. *Tienda*, 358 S.W.3d at 638.

Arnold stated that she received the emails at her email address from Parsons's email address and that Parsons's represented that the other emails in the string were to her from Appellant. Arnold further identified the exhibit as an accurate depiction of the emails she received from Parsons on December 30, 2013. In the email string, one of the emails purportedly from Appellant to Parsons refers to their impending divorce. Parsons's email forwarding the email string to Arnold contained Parsons's electronic signature, including her business address and business phone numbers. These facts proffered by the State, taken together, were sufficient to submit the ultimate question of authenticity to the jury; thus, the trial court did not abuse its discretion by ruling the emails admissible as a preliminary determination. *See, e.g.*, *Butler v. State*, 459 S.W.3d 595, 603–04 (Tex. Crim. App. 2015); *Sennett v. State*, 406 S.W.3d 661, 669 (Tex. App.— Eastland 2013, no pet.); *Massimo v. State*, 144 S.W.3d 210, 216 (Tex. App.— Fort Worth 2004, no pet.). We overrule point three.

## V.  CONCLUSION

Having overruled Appellant's points, we affirm the trial court's judgment.
*See* Tex. R. App. P. 43.2(a).

/s/ Lee Gabriel

LEE GABRIEL
JUSTICE

PANEL:  WALKER, GABRIEL, and SUDDERTH, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  April 7, 2016