Opinion issued May 11, 2017



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-16-00333-CR
_____

**JERRY DWIGHT SHINARD, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

On Appeal from the 176th District Court
Harris County, Texas
Trial Court Case No. 1357910

---

## MEMORANDUM OPINION

The State charged Appellant, Jerry Dwight Shinard, with capital murder.[1] The jury convicted Appellant of the lesser-included offense of felony murder[2] and assessed punishment at ten years' confinement. In one issue on appeal, Appellant argues that the trial court abused its discretion by denying his motion to suppress.

We affirm.

### Background

Appellant and Quincy Moss had been close friends until April 2012, when they stopped communicating over a dispute. In August of 2012, Appellant reached out to Moss, and they resumed their friendship.

A week later, on August 15, Appellant found Moss at Moss's uncle's house. Appellant asked to use Moss's apartment for a drug sale. Moss refused. The two discussed the matter until Moss finally agreed. Appellant and Moss drove to meet some others that would participate in the drug sale. All told, there were two women and four men. The six drove over to Moss's apartment complex in two cars. At this time, Appellant revealed to Moss that he and his friends intended to steal the drugs, instead of paying for them.

---

[1] *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (Vernon 2011), § 19.03(a)(2) (Vernon Supp. 2016).

[2] *See id.* § 19.02(b)(3).

Moss and the two women remained in the cars during the time at the apartment complex, except for a moment shortly after arriving when Moss and one of the women briefly got out of the cars. Video surveillance of the apartment complex show Appellant and two other men moving around the complex.

At one point, Appellant was by the cars when the security guard for the complex walked by. As the guard approached the cars, Appellant walked up to him, greeted him, and shook his hand. The guard returned the greeting and continued to patrol the premises.

Around 5:50 that evening—about an hour after Appellant and his friends arrived—three Hispanic men arrived at the complex. Appellant and one of his friends came to the parking lot to meet them. The five men walked to Moss's apartment.

One of the Hispanic men, Robert Villalobos, would later testify at trial about what happened next. Villalobos testified that the five of them walked into the apartment. One of Villalobos's friends had brought 2-3 pounds of marijuana, packaged and then wrapped in packing tape. Villalobos and one of his friends were standing in the kitchen area of the room, while the other friend stood near the door. After one of Appellant's friends opened the package and announced the marijuana was good, Appellant's other friend rushed out of the bedroom, brandishing a firearm. The man by the door attempted to flee. The man with the gun attempted to stop him.

3

In the struggle, the gun fired, striking the fleeing man and ultimately killing him. Appellant and his friends took the marijuana and fled.

Video surveillance of the apartment complex show Appellant and his two friends running towards their cars. As one of the cars is about to exit the complex, Appellant jumps in and drives away.

While in the car, Appellant discussed his involvement in the robbery. Appellant claimed to have fired a gun at a pillow but later dropped the gun. Appellant, Moss, and the woman in the car—Appellant's live-in girlfriend—drove to Appellant's apartment. While there, Moss learned that police were at his apartment and that someone had been killed there. Appellant swore to Moss that he did not shoot anyone.

Moss went to his uncle's house later that evening. While there, he talked to Appellant on the telephone. Appellant told Moss that, if Moss told the police what happened, Appellant would have to "ice" someone else. Moss testified that to ice someone means to kill them and that he understood the "someone else" to be him.

Police were able to obtain information about the fleeing vehicles from the surveillance videos. The day after the shooting, Lieutenant R. Blain and Sergeant J. Robles of the homicide division of the Houston Police Department watched Appellant's apartment complex. At one point, they saw the car Appellant had driven during the shooting leave Appellant's apartment complex. They arranged for patrol

4

officers to follow the car and ultimately pull it over. Appellant was driving the car when it was pulled over. The police arrested Appellant and drove back to the apartment complex with him.

At the complex, Lieutenant Blain, Sergeant Robles, and two patrol officers approached Appellant's apartment. Appellant's live-in girlfriend, Kristane Samuel-Curry, answered the door. The police asked for permission to search the apartment, and Curry consented. After doing an initial sweep to verify no one else was in the apartment, Lieutenant Blain and Sergeant Robles asked Curry to sign a written consent to search. Curry signed it.

Curry was taken to a patrol car in front of the apartment as the police searched the apartment. They found approximately 1.82 pounds of marijuana. They also seized a pair of shorts matching what Appellant had worn the day before.

After a while, the police left the apartment, locking it behind them. Some officers took Curry and Appellant to the police station while Lieutenant Blain and Sergeant Robles went to the apartment complex where the shooting had occurred. They watched the surveillance video. While watching the video, the officers recalled seeing shoes in Appellant's apartment that matched what he wore during the shooting.

Based on this, Lieutenant Blain and Sergeant Robles returned to Appellant's apartment complex. They showed the apartment manager the signed consent to

5

search. The apartment manager gave them a key to open Appellant's apartment. Lieutenant Blain and Sergeant Robles recovered the shoes they had seen and left. They left about two hours after Curry had signed the consent to search.

Dried blood was found on one of Appellant's shoes. DNA testing established that the blood came from the man shot in Moss's apartment. Before trial, Appellant filed a motion to suppress evidence of the shoes and the DNA testing on them. Appellant argued that Curry's consent to search the apartment terminated when Lieutenant Blain and Sergeant Robles left it the first time. Accordingly, Appellant argued, they did not have consent or a valid warrant to enter the apartment the second time. The trial court denied the motion.

At trial, the State offered other DNA evidence linking Appellant to the robbery and shooting. A cigar butt had been found in Moss's apartment. DNA testing revealed a major contributor and minor contributor on the cigar. Appellant was the major contributor.

Testimony at trial established that a blunt is a cigar with at least some of its tobacco removed and replaced with marijuana. Moss testified that he had smoked blunts with Appellant before. He also testified that he and Appellant had not smoked any marijuana together in the week between when the two had reconnected and when the shooting took place.

6

## Standard of Review

In his sole issue, Appellant argues the trial court abused its discretion by denying his motion to suppress. We review a trial court's denial of a motion to suppress evidence under a bifurcated standard of review. *Turrubiate v. State*, 399 S.W.3d 147, 150 (Tex. Crim. App. 2013). We give almost total deference to a trial court's determination of historical facts, especially if those determinations turn on witness credibility or demeanor, and we review de novo the trial court's application of the law to facts not based on an evaluation of credibility and demeanor. *Gonzales v. State*, 369 S.W.3d 851, 854 (Tex. Crim. App. 2012).

We review the harm resulting from a trial court's erroneous denial of a motion to suppress and subsequent admission of evidence obtained in violation of the Fourth Amendment under the constitutional harmless-error standard. TEX. R. APP. P. 44.2(a); *see also Hernandez v. State*, 60 S.W.3d 106, 108 (Tex. Crim. App. 2001) (mandating application of Rule 44.2(a) to harm analysis of trial court's erroneous denial of motion to suppress under Fourth Amendment). This standard requires us to reverse the trial court's judgment of conviction unless we determine "beyond a reasonable doubt that the error did not contribute to the conviction or punishment." TEX. R. APP. P. 44.2(a); *see also Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008). In applying the harmless-error test, the primary question is whether there is a "reasonable possibility" that the error might have contributed to the

conviction. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (internal quotations omitted).

We do not focus on the propriety of the outcome of the trial. Instead, we calculate, as much as possible, the probable impact of the evidence on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000). We "should take into account any and every circumstance apparent in the record that logically informs an appellate determination whether 'beyond a reasonable doubt [that particular] error did not contribute to the conviction or punishment,'" and if applicable, we may consider the nature of the error, the extent that it was emphasized by the State, its probable collateral implications, and the weight a juror would probably place on the error. *Snowden v. State*, 353 S.W.3d 815, 822 (Tex. Crim. App. 2011) (quoting TEX. R. APP. P. 44.2(a)). This requires us to evaluate the entire record in a neutral, impartial, and even-handed manner and not "in the light most favorable to the prosecution." *Harris v. State*, 790 S.W.2d 568, 586 (Tex. Crim. App. 1989) (internal quotations omitted), *disagreed with in part on other grounds by Snowden*, 353 S.W.3d at 821–22; *Daniels v. State*, 25 S.W.3d 893, 899 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Error does not contribute to the conviction or punishment if the jury's verdict would have been the same even if the erroneous evidence had not been admitted. *Clay v. State*, 240 S.W.3d 895, 904 (Tex. Crim. App. 2007).

**Motion to Suppress**

When police arrived at the apartment, Curry signed a consent to search the apartment. Curry was in a patrol car in front of the apartment while the search was conducted. Police locked up the apartment and went to another location, and Curry and Appellant were taken to a police station for questioning. Within two hours of Curry signing the consent, the police returned to the apartment complex, got a key from the apartment manager, re-entered the apartment, and took a pair of shoes belonging to Appellant. The victim's blood was on one of Appellant's shoes.

Appellant argues that the signed consent did not extend to the police's second search of the apartment and that, accordingly, the shoes and all related evidence should have been suppressed. We hold that, even if it was error for the trial court to deny the motion to suppress, the error is harmless. *See Mosley*, 983 S.W.2d at 259.

To properly evaluate harm, we must determine what evidentiary value the shoes have. *See Wesbrook*, 29 S.W.3d at 119; *Snowden*, 353 S.W.3d at 822. Here, the victim's blood on Appellant's shoes establishes his presence at the crime scene. *See Meggs v. State*, 438 S.W.3d 143, 147 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd) (holding victim's DNA on defendant's pants established presence at scene).

9

Appellant concedes that other evidence establishes his presence at the apartment complex around the time of the offense. He argues, however, that only the shoes directly establish his presence within the apartment. We disagree.

Working from more specific evidence to more general evidence, we begin with the fact that Villalobos was in the apartment during the offense. Villalobos testified that he met Appellant in the parking lot, shook hands with him, followed him into the apartment, stood next to him in the kitchen, and watched him tackle one of his friends to the ground when the man with the gun came out of the bedroom. Villalobos identified Appellant in a photographic array shortly after the offense and again at trial.

Next, a cigar stub was found in the apartment with Appellant's DNA identified as the major contributor. Evidence established that it could have been a blunt (a cigar with some or all of the tobacco replaced with marijuana), that Moss and Appellant had smoked blunts in the past, and that they had not smoked any marijuana together in the four months leading up to the offense. The jury could reasonably infer from this evidence that Appellant had left the stub there during the preparation for the offense or during the offense itself.

In addition, as Appellant notes, multiple pieces of evidence place Appellant in the apartment complex during the offense. Moss testified that Appellant was

working to coordinate the robbery. He testified that Appellant had his apartment key.

Surveillance video corroborates Moss's and Villalobos's testimony. While it does not show the people in enough detail to allow identification from the video itself, the surveillance video does show enough detail to show body shape, skin color, and style and color of clothing. Both Moss and Villalobos identified people depicted in the surveillance video. Both identified Appellant as the person seen wearing a dark t-shirt, green shorts, and white shoes. The shorts found in Appellant's apartment during the first search are consistent with the shorts depicted in the video.

The video also establishes that the security guard passed by the cars at a time when Appellant was also near the cars. This corroborates the security guard's testimony placing Appellant at that location before the shooting.

The most significant impact of the surveillance video, however, is that it shows three people that leave the cars before the shooting and that run to the cars after the shooting. For the jury to conclude that Appellant was not in the apartment, then, the jury would have to conclude that an extra person was present at the complex who managed to avoid any interactions with the other three on the surveillance video. The jury would also have to conclude that this extra person somehow managed to replace himself with Appellant after Appellant met Villalobos in the parking lot but before going into the apartment complex, all without Villalobos

11

noticing. This was not a theory developed at trial, and there is no evidence to support it.

Finally, Appellant's statements to Moss after the offense describe his participation in the robbery, not avoidance of it. When Moss later learned that someone had been shot in the process, rather than asserting ignorance of what happened, Appellant affirmatively asserted he had not been the one to shoot the victim. Later, Appellant threatened that, if Moss talked to police, Appellant would have to "ice" someone else, indicating Appellant's participation in killing someone already.

Multiple pieces of evidence firmly establish Appellant's presence in the apartment. Against this, there was no contradictory evidence to indicate Appellant's presence at another location. *See Nonn v. State*, 117 S.W.3d 874, 883 (Tex. Crim. App. 2003) (holding admission of challenged evidence, "although powerful evidence by itself," was harmless due to other evidence establishing "essentially the same information"). Accordingly, we hold that any error in the admission of Appellant's shoes and related evidence was harmless.

We overrule Appellant's sole issue.

## Conclusion

We affirm the judgment of the trial court.


Laura Carter Higley
Justice

Panel consists of Justices Higley, Bland, and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).

13